FOURTH DIVISION
December 2, 2010

No. 1-08-0425

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 82 C 8655 |
| | ) | |
| STANLEY WRICE, | ) | Honorable |
| | ) | Evelyn B. Clay, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Stanley Wrice, appeals the order of the circuit court denying him leave to file a second successive postconviction petition alleging his confession was the product of torture perpetrated by police officers at Area 2 Police Headquarters (Area 2). The petition referenced the Report of the Special State's Attorney released in 2006 that found proof beyond a reasonable doubt that police officers under the command of Jon Burge at Area 2 and Area 3 had engaged in the torture of criminal suspects. Defendant contends the Report of the Special State's Attorney satisfies the cause-and-prejudice test allowing for the filing of the second successive postconviction petition. We reverse and remand for a third-stage evidentiary hearing on defendant's second successive postconviction petition.

In the early morning hours on September 9, 1982, police arrested defendant at his home along with Charles Wrice, Bobbie Joe Williams, and Rodney Benson. Defendant was a suspect in the sexual assault of K.B. (the victim), which occurred on September 8, 1982, at defendant's home in Chicago. Before trial, the court held a hearing on defendant's motion to suppress his confession to police. Defendant alleged his confession was involuntary because Sergeant John Byrne and Detective Peter

Dignan severely beat him in the basement of Area 2 to coerce the confession.

At the hearing, defendant testified that after police arrested him, they brought him to a room on the second floor of Area 2. Approximately 45 minutes later, Sergeant Byrne and Detective Dignan came into the room and asked defendant to tell them what had happened at his home earlier that morning. Defendant responded that he, Bobby Williams, and Rodney Benson had gone to a store and then returned home. Not satisfied with that answer, Detective Dignan asked defendant to stand up, "unhandcuffed" his hand from the ring on the wall, and told him he was "fixing to do some police brutality."

Defendant testified Sergeant Byrne and Detective Dignan took him to a basement room at Area 2. Detective Dignan told defendant that if he confessed, he would not be in the room long. Sergeant Byrne again asked defendant about what had occurred at his home earlier that morning, and defendant repeated what he had told the officers earlier. Sergeant Byrne told defendant he was lying and hit him on the forehead with a flashlight that was approximately 15 or 16 inches long. Detective Dignan struck defendant on the leg with a solid piece of rubber and told him to tell the truth. Defendant repeated he already had told them everything he knew.

Defendant testified Sergeant Byrne and Detective Dignan took him upstairs and placed him in a room with a camera. Approximately an hour and a half later, they took him back to the basement room and told him Rodney Benson had implicated him in the offenses. Detective Dignan struck defendant on the leg with the piece of rubber. Sergeant Byrne struck defendant on the right arm with the flashlight, while Detective Dignan struck him on the left arm. Sergeant Byrne then told defendant to stand up. He did so. Sergeant Byrne turned defendant around so his back was facing

them, put his hands over his head, and kicked his legs apart. Then Sergeant Byrne hit defendant multiple times in the groin with the flashlight. Detective Dignan also hit defendant in the groin with the piece of rubber.

Defendant testified they took him upstairs to speak with Assistant State's Attorney (ASA) McCurry. Detective Dignan never left the room during his discussion with ASA McCurry. ASA McCurry testified defendant made a statement at approximately 1 p.m. and again at approximately 1:30 p.m. and that Detective Dignan was present during both interviews.

Karem Ali I. Abdal-Aziz, a Cook County paramedic, examined defendant on September 10, 1982, after his arrest. Defendant told Mr. Abdal-Aziz he had an injury on the left side of his head and other injuries resulting from blunt trauma. Defendant stated he had an injury to his groin, thighs or kneecaps, right and left biceps, left shoulder, right hand, and his breastbone or sternum. Mr. Abdal-Aziz asked defendant how long he had suffered from those injuries, and defendant replied, "one day." Mr. Abdal-Aziz testified he did not personally observe the injuries to defendant's groin or to his thighs or kneecaps because defendant only took his clothes off from the waist up. Mr. Abdal-Aziz filled out a form indicating he observed defendant's injuries from the waist up; however, Mr. Abdal-Aziz also testified he had no independent recollection of viewing those injuries.

Doctor Stanley Harper, a physician with Cermak Health Services, examined defendant on September 15, 1982. Defendant told Doctor Harper that one week earlier, Chicago police officers had beaten him with a flashlight and billy club. Defendant complained of pain in his groin, blood in his urine 24 to 48 hours after the attack, and scrotal tenderness. Doctor Harper found no lacerations or masses of the scrotum. Doctor Harper noted multiple healing bruises on defendant's left anterior

leg. Doctor Harper concluded defendant had a history of multiple blunt trauma.

Sergeant Byrne and Detective Dignan testified they did not beat defendant, nor did they see anyone else beat defendant.

The circuit court denied defendant's motion to suppress, finding the officers to be credible.

The cause proceeded to a jury trial. Testimony at trial established that on September 9, 1982, the victim, who had been drinking all day, was walking to a liquor store when several men in a car approached her. One of the men later was identified as defendant. The victim agreed to ride with them to the liquor store. When she realized the men were not driving her to the liquor store, she requested they let her out of the car. Instead, they drove her to defendant's residence on South Chappel Avenue, in Chicago. While at defendant's residence, she was beaten, burned, and raped.

Kenneth Lewis testified he was on the first floor of defendant's house while the defendant and others were upstairs with the victim. At some point, Mr. Lewis went upstairs and saw several men have sexual intercourse with the victim and he saw defendant hit the victim. Mr. Lewis also stated he tried to pull defendant off the victim. After defendant stopped hitting her, Mr. Lewis went downstairs. Later, defendant came downstairs and picked up an iron from the stove. Mr. Lewis took the iron from him and defendant went back upstairs. Mr. Lewis heard slapping sounds so he went upstairs and saw defendant beating the victim.

Mr. Lewis stated he later left the house. When he returned, he went upstairs and found the victim lying on the bed. There were burn marks in the shape of an iron on her breast and legs and she was burned from her head to her toe. Mr. Lewis returned downstairs. Shortly thereafter, defendant came downstairs and took a hot spoon off the stove. Defendant returned upstairs, at which point Mr.

Lewis heard the victim ask, "Why are you burning me?" Then he heard the victim falling down the stairs and again saw defendant strike her.

The State's second witness, Bobbie Joe Williams, testified he observed defendant have sexual intercourse with the victim. Mr. Williams stated he saw defendant take an iron off the top of the stove and walk upstairs. The next morning, defendant told him they had "burned that bitch."

ASA Kenneth McCurry testified that at approximately 1:35 p.m. on September 9, 1982, defendant made an oral confession. Defendant stated that at about 11 p.m. on the night before, he saw Rodney Benson in a car with the victim. Defendant and Bobbie Jo Williams then walked to defendant's home at 7618 South Chappel. About 10 minutes later, Mr. Benson came to the door and asked to use a bed. Defendant replied affirmatively, and Mr. Benson came inside with the victim and took her to a room on the second floor. Defendant later went into the room, where he saw the victim and Mr. Benson, Lee Holmes and Michael Fowler. A man who had come over on a bicycle was having sex with the victim. After they finished, Mr. Benson had sex with her too. Mr. Benson was slapping and hitting the victim while they were having sexual intercourse.

Defendant further stated to ASA McCurry that another man came upstairs with a hot iron. Mr. Benson took the iron and burned the victim over most of her body. Then defendant took the iron from Mr. Benson and dropped it on the victim's thighs.

Doctor Nolan Lewis testified he saw the victim at the burn unit of the Loyola Medical Center, where she was in the intensive care unit. Her injuries extended from her head to her toes and were predominantly bruises and burns. There were approximately 100 bruises varying in size from that of a dime all the way up to two or three inches in diameter. Her face was swollen with two burns on

the right side of her face and chin with some minor burns around the corner of her mouth. Her neck was bruised. A large area on the left side of her chest and extending to her breast had been burned by a clothing iron. It was a second-degree burn. She had second-degree burns on her thighs that also were inflicted by an iron. A second-degree burn is one only partly through the skin; the bottom layer of the skin is preserved so that the skin can regenerate and heal on its own. There was a third-degree burn on her right breast over her nipple. A third-degree burn means the burn is all the way through the skin and that the full thickness of the skin is destroyed. There were burns and bruises of a superficial nature on her abdomen and on the lower part of her trunk.

Doctor Lewis testified the main injuries were to the victim's back. The upper part had third-degree burns. Her deepest burns were on her buttocks in the shape of an iron. There were also third-degree burns on her upper thighs on the back that had been inflicted by something other than an iron. Because the burns were of a third-degree and of a large area, there had to be skin grafting performed 11 days later. The grafting was done on her right breast, upper back, and buttocks. As a result of the surgery, the victim lost a portion of her right nipple. Most of her buttocks required skin grafting. The burns covered at least 80% of her back. The scarring from the burns and the skin graft is permanent.

Defendant testified he was in the house at the time of the offense, but he did not participate in the rape and did not know the victim was being raped. He testified he saw a woman with several men in his upstairs quarters but did not inquire as to why they were there. Defendant testified consistently with his testimony at the motion to suppress regarding Sergeant Byrne and Detective Dignan beating him during his interrogation. Defendant also testified he never confessed to ASA

McCurry about participating in the offenses.

Defendant's sister, Patricia Wrice, testified she lived in the downstairs rooms of defendant's residence. She testified several men took a woman to the upstairs rooms and engaged in sexual intercourse, but she never saw defendant go upstairs. However, she also testified that at the time the men were upstairs with the victim, she was in her downstairs bedroom, but defendant was not in the bedroom with her during this time.

The jury convicted defendant of rape, deviate sexual assault, armed violence, and unlawful restraint. The circuit court sentenced defendant to a 60-year term of imprisonment for rape and 40 years' imprisonment for deviate sexual assault, to run consecutively; 7 years for armed violence, to run concurrently; and 5 years for unlawful restraint, to run concurrently.

Defendant filed a direct appeal, arguing: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the circuit court abused its discretion by admitting photographs of the victim into evidence and allowing the jurors to view them in the jurors' room; (3) his aggregate sentence was excessive; (4) the circuit court abused its discretion in imposing extended sentences for the rape and deviate sexual assault convictions; (5) the circuit court abused its discretion in convicting him of unlawful restraint; and (6) the jury instructions on the armed violence conviction were a violation of his due process rights. See People v. Wrice, 140 Ill. App. 3d 494, 496 (1986).

The appellate court affirmed defendant's convictions and sentences for rape and deviate sexual assault, but vacated the armed violence and unlawful restraint convictions and sentences. Wrice, 140 Ill. App. 3d at 502.

On April 2, 1991, defendant filed a pro se postconviction petition. Defendant alleged, among

other claims, that he suffered a violation of his constitutional rights when Sergeant Byrne and Detective Dignan beat him at Area 2. The circuit court summarily dismissed defendant's pro se postconviction petition. The appellate court affirmed the dismissal. See People v. Wrice, No. 1-91-2332 (February 14, 1994) (unpublished order under Supreme Court Rule 23).

On May 13, 2000, defendant filed his first successive postconviction petition. Defendant alleged, among other claims, that his confession was involuntary because he was tortured by Sergeant Byrne and Detective Dignan. The circuit court appointed counsel to represent defendant and later granted the State's motion to dismiss.

Defendant filed a motion to reconsider and attached multiple reports from the Office of Professional Standards (OPS), the investigative arm of the Chicago police department, detailing its investigation of physically abusive interrogation techniques committed by Chicago police officers at Area 2 under the command of Jon Burge. Specifically, OPS "sustained" the following allegations of abuse, meaning the OPS investigator found the allegations were proven by a preponderance of the evidence: (1) on October 29, 1983, while at Area 2, Sergeant Byrne struck Gregory Banks about the chest and stomach with a flashlight during an interrogation, failed to report to OPS his use of excessive force against Mr. Banks, and later gave false testimony that Mr. Banks was not abused while in police custody; (2) on October 29, 1983, Detective Dignan failed to report to a supervisor the use of excessive force against Mr. Banks and later gave a false statement to OPS regarding the use of excessive force against Mr. Banks; (3) on November 3, 1984, Sergeant Byrne struck Stanley Howard repeatedly about the body with his fists and repeatedly kicked Mr. Howard about the left leg while inside an interview room at Area 2; (4) on January 28, 1984, while inside an interview room

at Area 2, Detective Dignan removed Thomas Craft's shoes and ground the heel of his thick-soled shoes into the top of Mr. Craft's feet; (5) on November 2, 1983, in a wooded area behind the Altgeld Gardens, Detective Dignan stuck a shotgun into Darrell Cannon's mouth three times and each time pulled the trigger, although the shotgun was not loaded; (6) on November 2, 1983, in a wooded area behind the Altgeld Gardens, Detective Dignan lifted Mr. Cannon off the ground while Sergeant Byrne held him by the handcuffs up in the air; and (7) Sergeant Byrne applied a cattle prod and electroshocked Mr. Cannon in his testicles and applied a gun to Mr. Cannon's head.

The circuit court denied defendant's motion for reconsideration, finding the petition was untimely and did not satisfy the criteria for consideration of a successive petition. The appellate court affirmed. See People v. Wrice, No. 1-01-1697 (December 31, 2003) (unpublished order under Supreme Court Rule 23).

Meanwhile, in April 2002, the presiding judge of the criminal division of the circuit court of Cook County appointed a Special State's Attorney to investigate the allegations of police torture and abuse committed by Jon Burge, a commander within the Chicago police department during the 1980s and early 1990s, and the officers acting under his command at Area 2 and Area 3. The Report of the Special State's Attorney (sometimes referred to herein as the Report) was released on July 19, 2006.

The Special State's Attorney determined "the admissible evidence would justify *** asking a grand jury to indict in three cases: they are the cases of Andrew Wilson, Phillip Adkins, and Alfonso Pinex. There are many other cases that raised the belief that the claimant was telling the truth, e.g. Michael Johnson, Melvin Jones and Shadeed Mumin, but their testimony would not be sufficient to establish proof beyond a reasonable doubt." Report of the Special State's Attorney 12 (July 19,

2006). The Special State's Attorney concluded Mr. Burge was guilty of prisoner abuse and "[it] necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they." Report of the Special State's Attorney 16 (July 19, 2006). However, the statute of limitations barred prosecution of any of the officers.[1] Report of the Special State's Attorney 13 (July 19, 2006).

In his Report, the Special State's Attorney specifically named Detective Dignan and Sergeant Byrne as officers accused of making false statements regarding their torture of prisoners. Report of the Special State's Attorney 33-34 (July 19, 2006). The Special State's Attorney declined prosecution, though, because the statute of limitations had expired and because some of the statements had been made to someone other than a law enforcement officer or to a person whose duty it was to receive information in connection with either a court proceeding or some official investigation. Report of the Special State's Attorney 33-34 (July 19, 2006).

After the Special State's Attorney released his Report, defendant filed a petition for leave to file a second successive postconviction petition on October 23, 2007 (hereinafter the October 23, 2007, petition). Defendant cited the Report as new evidence corroborating his claims that his confession and Mr. Williams' statement implicating him were the product of police torture. The circuit court denied defendant leave to file his second successive postconviction petition, stating in pertinent part:

"Although the factual assertions relied upon by petitioner in the instant petition were available

---

[1] In June 2010, a federal jury convicted Mr. Burge of two counts of obstruction of justice and one count of perjury for lying in a 2003 civil lawsuit about his use or knowledge of torture of criminal suspects. Mr. Burge is currently awaiting sentencing on his convictions.

to him at the time his first successive post-conviction petition was filed, he has failed to identify any objective factor which impeded his efforts to raise the claims in the earlier proceeding. Indeed, petitioner has already raised these identical claims in an earlier petition. He attaches the recently-filed Special Prosecutor's Report to bolster his claims. Yet, petitioner argues mere conclusion[s] rehashed from his trial transcript and analogizes his case to other cases where police brutality was found to have existed. This is legally insufficient to merit further review."

Defendant now appeals the order of the circuit court denying him leave to file his second successive postconviction petition.

A proceeding brought under the Postconviction Hearing Act (the Act) (725 ILCS 5/122-1 et seq. (West 2002)) "is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." People v. Evans, 186 Ill. 2d 83, 89 (1999). Such a proceeding "allow[s] inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." People v. Barrow, 195 Ill. 2d 506, 519 (2001). In the first stage, the circuit court determines whether the petition is "frivolous" or "patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2002). If the postconviction petition is not so summarily dismissed, it advances to the second stage, where the circuit court must determine whether the petition and any accompanying documents make a substantial showing of a constitutional violation. See People v. Coleman, 183 Ill. 2d 366, 381 (1998). If the petition fails to make a substantial showing of a constitutional violation, it is dismissed; if such a showing is made, the postconviction petition advances to the third stage, where the circuit court conducts an evidentiary hearing. 725

ILCS 5/122-6 (West 2002). Defendant is not entitled to an evidentiary hearing on a postconviction petition as a matter of right. Barrow, 195 Ill. 2d at 519. "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in accompanying affidavits are taken as true." People v. Orange, 195 Ill. 2d 437, 448 (2001). Dismissal of a postconviction petition is reviewed de novo. Coleman, 183 Ill. 2d at 378-89.

The Act contemplates the filing of only one postconviction petition. People v. Morgan, 212 Ill. 2d 148, 153 (2004). However, the statutory bar to a successive postconviction petition is relaxed "when fundamental fairness so requires." Morgan, 212 Ill. 2d at 153. Fundamental fairness allows the filing of a successive petition only when the petition complies with the cause-and-prejudice test. People v. Pitsonbarger, 205 Ill. 2d 444, 459 (2002). Defendant shows "cause" by identifying an objective factor external to the defense that impeded his efforts to raise his claim in the earlier proceeding. Pitsonbarger, 205 Ill. 2d at 460. Defendant shows prejudice by demonstrating the claimed constitutional error "so infected the entire trial that the resulting conviction or sentence violates due process." Pitsonbarger, 205 Ill. 2d at 464. The legislature has codified the cause-and-prejudice test in section 122-1(f) of the Act. See 725 ILCS 5/122-1(f) (West 2006). In reviewing the circuit court's ruling on whether a defendant has satisfied the cause-and-prejudice test of section 122-1(f), the reviewing court applies the de novo standard of review. People v. Williams, 394 Ill. App. 3d 236, 242 (2009).

In the present case, the issue on appeal is whether defendant's October 23, 2007, petition, which alleges his confession was the result of torture committed by Sergeant Byrne and Detective Dignan, satisfies the cause-and-prejudice test. The State contends defendant has failed to satisfy the

"cause" prong of the test which, as discussed above, requires him to identify an objective factor that impeded him from raising his claims in the earlier proceedings. The State argues defendant already raised the claims of torture in both of the prior postconviction petitions and previously referenced OPS reports indicating widespread torture practices at Area 2. The State further argues that defendant has failed to satisfy the "prejudice" prong of the test because the October 23, 2007, petition is cumulative to the allegations previously raised and rejected in the earlier postconviction proceedings. Therefore, the State contends defendant is barred under the cause-and-prejudice test from raising these same torture claims yet again.

The State's argument with respect to "cause" is unavailing. In his October 23, 2007, petition, defendant raised <u>for the first time</u> the argument that the Report of the Special State's Attorney significantly corroborates his torture claims. Defendant could not have raised the Report in the earlier 1991 and 2000 postconviction proceedings because the Special State's Attorney did not release the Report until July 19, 2006. As such, defendant has satisfied the "cause" prong of the test by identifying an objective factor (the release date of the Report) that impeded him from raising the Report in the earlier postconviction proceedings.

The State's argument as to "prejudice" is equally unavailing. The State contends defendant was not prejudiced by the circuit court's denial of leave to file the October 23, 2007, petition referencing the Report of the Special State's Attorney, because the evidence against defendant was overwhelming and the Report is cumulative to other evidence of widespread torture practices in Area 2 and would not change the result on retrial.

The Report of the Special State's Attorney cannot be considered cumulative evidence, where

-13-

it represents, for the first time, an independent evaluation by the Special State's Attorney of 148 complaints of torture perpetrated by police officers under the command of Jon Burge at Area 2 and Area 3 from 1973 to 2006. Sergeant Byrne and Detective Dignan are two of the officers named in the Report. Unlike the earlier OPS reports that found certain allegations of torture were established by the civil-trial standard of proof by a preponderance of the evidence, the Report of the Special State's Attorney found that evidence of torture in certain cases had been established by the stricter, criminal-trial standard of proof beyond a reasonable doubt. The Report also found many other cases "raised the belief" that claimants were telling the truth about their torture allegations. This evidence in the Report of widespread, systematic torture of prisoners at Area 2 at or near the time of defendant's incarceration adds further corroboration of defendant's claims his confession was procured by torture.

Our supreme court has held "[t]he use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error." (Emphasis added.) People v. Wilson, 116 Ill. 2d 29, 41 (1987). Our supreme court also has held that a defendant has presented sufficient evidence at the pleading stage to entitle him to a postconviction, evidentiary hearing when: (1) he has consistently claimed he was tortured; (2) his claims are "strikingly similar" to other claims of torture; (3) the officers allegedly involved are identified in other allegations of torture; and (4) the defendant's allegations are consistent with OPS findings of systemic and methodical torture at Area 2 under Jon Burge. People v. Patterson, 192 Ill. 2d 93, 145 (2000). As in Patterson, defendant in the present case has: (1) consistently claimed, during his motion to suppress, at trial, and on postconviction review, that he was tortured; (2) his claims of being beaten are strikingly similar to those of other

prisoners at Areas 2 and 3; (3) the officers involved, Sergeant Byrne and Detective Dignan, are identified in other allegations of torture; and (4) defendant's allegations are consistent not only with OPS findings (under the preponderance of the evidence standard of proof) of systemic and methodical torture at Area 2 under Jon Burge, but also with the Report's findings of torture under the stricter standard of proof beyond a reasonable doubt. As such, defendant has satisfied the "prejudice" prong of the cause-and-prejudice test. We reverse and remand for a third-stage evidentiary hearing on defendant's second successive postconviction petition.

The State contends People v. Hobley, 182 Ill. 2d 404 (1998), compels a different result. In Hobley, a jury convicted Madison Hobley of seven counts of felony murder, one count of arson, and seven counts of aggravated arson. Hobley, 182 Ill. 2d at 410. Mr. Hobley was sentenced to death. Hobley, 182 Ill. 2d at 410. On direct appeal, the supreme court affirmed Mr. Hobley's convictions and death sentence. Hobley, 182 Ill. 2d at 410. Mr. Hobley later filed a second-amended petition for postconviction relief, which the circuit court dismissed without conducting an evidentiary hearing. Hobley, 182 Ill. 2d at 410. On appeal to the supreme court, Hobley argued he was entitled to a hearing on his claim that newly discovered evidence of torture perpetrated by officers at Area 2 would have established his alleged confessions were involuntary and coerced, making their introduction at his trial a violation of his constitutional rights. Hobley, 182 Ill. 2d at 444-45. The newly discovered evidence consisted of reports, transcripts and other documents setting forth other allegations of abuse by police officers at Area 2. Hobley, 182 Ill. 2d at 445.

The supreme court noted that in its earlier opinion on direct appeal, it held the circuit court did not err in excluding Mr. Hobley's evidence of prior police brutality because he had not shown any

injuries commensurate with his alleged beatings. Hobley, 182 Ill. 2d at 448. The supreme court noted that on postconviction review, Mr. Hobley failed to submit any new evidence of physical injuries. Hobley, 182 Ill. 2d at 448. Accordingly, the supreme court held its "determination on direct appeal that [Mr. Hobley] did not suffer injuries consistent with his claims of abuse is not altered by [his] new evidence. This issue is therefore barred by res judicata." Hobley, 182 Ill. 2d at 448-49.

The supreme court further held "fundamental fairness" did not require the relaxation of the res judicata bar, as Mr. Hobley had consistently testified at his suppression hearing and at trial that he never even made the confessions that he now claimed were the product of police coercion. Hobley, 182 Ill. 2d at 449. The supreme court concluded:

"Accordingly, in order for the jury to have concluded that [Mr. Hobley's] confessions were coerced, the jury would have had to believe [his] testimony that he was physically abused, but disbelieve his testimony that he did not confess. Thus, the contention that [Mr. Hobley] confessed but that the confession was the product of coercion was not a particularly persuasive one for the defense. For this reason, we conclude that it is not likely that, had this new evidence of brutality allegations been introduced, the jury would have concluded that [Mr. Hobley's] confessions were coerced. [Mr. Hobley's] primary challenge to the confessions was that they were fabricated by police, and evidence that other suspects were allegedly coerced into confessing would not have directly aided that position." Hobley, 182 Ill. 2d at 450.

In the present case, the State contends, as in Hobley, that defendant consistently maintained he never confessed to the crimes and therefore he was not prejudiced by the denial of leave to file his

October 23, 2007, petition alleging his nonexistent confession was coerced and that other prisoners in unrelated cases had been coerced into making confessions. The State contends, as in Hobley, that evidence that other persons were allegedly coerced into confessing would not have directly aided his position that he never made any confession himself.

Defendant responds he never denied making an inculpatory statement. However, review of the trial record indicates otherwise; defendant testified at trial that he did not confess to the crimes. Defendant's testimony was contradicted by ASA McCurry, who testified to defendant's confession.

Nonetheless, despite defendant's denial of making a confession to ASA McCurry, the State's argument based on Hobley is unavailing. In contrast to Hobley, defendant in the present case provided medical evidence corroborating his allegations of torture. See the testimony of Mr. Abdal-Aziz and Doctor Harper, recounted above. Also, unlike in Hobley, which was decided in 1998, defendant here has referenced the Report of the Special State's Attorney released in 2006. As discussed, the Report found evidence of torture perpetrated by officers at Area 2 had been proven beyond a reasonable doubt. Such findings provide significant corroboration of defendant's torture claims. A jury here could believe ASA McCurry's testimony that defendant confessed, but it also could believe the confession was coerced based on defendant's testimony of physical abuse that was supported by the medical evidence, OPS reports, and the Report of the Special State's Attorney. Defendant has satisfied the cause-and-prejudice test for filing his second successive postconviction petition.

For the foregoing reasons, we reverse and remand for a third-stage, evidentiary hearing on defendant's second successive postconviction petition. As a result of our disposition of this case, we

No. 1-08-0425

need not address the other arguments on appeal.

      Reversed and remanded.

      GALLAGHER, P.J., and LAVIN, J., concur.