**2022 IL 126682**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126682)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. HAROLD BLALOCK, Appellant.

*Opinion filed September 22, 2022.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Theis, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Justices Neville and Holder White took no part in the decision.

**OPINION**

¶ 1        In 2016, defendant Harold Blalock filed a motion in the circuit court of Cook County seeking leave to file a second successive postconviction petition challenging his 2000 conviction for murder. Defendant alleged that newly

discovered evidence showed that the police officers who interrogated him had engaged in a pattern and practice of police brutality and that his resulting confession was the product of police coercion. The circuit court denied defendant leave to file his successive petition, finding he failed to establish both cause and prejudice as required by section 122-1(f) of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2016)). On appeal, the appellate court concluded that defendant had failed to establish cause and affirmed. 2020 IL App (1st) 170295. We now affirm the judgment of the appellate court, although we do so on other grounds.

¶ 2                                                    BACKGROUND

¶ 3        On January 22, 1999, at approximately 6 p.m., Veronica Riley was shot and killed near the corner of 51st Street and South Racine Avenue in Chicago. Police investigators spoke with an eyewitness to the crime, Tara Coleman, who gave a signed, written statement on January 24, 1999, in the presence of Assistant State's Attorney Clarissa Palermo and Chicago police detective James O'Brien.

¶ 4        In her statement, Coleman stated she was at "Mr. B's" barbershop on 51st Street, just east of Racine Avenue, on January 22, 1999. At approximately 6 p.m., defendant, whom she knew from grammar school, entered. The two said hello and hugged, and defendant went to use the pay phone. Approximately five minutes later, three men, whom Coleman did not know, came into the shop. Defendant got off the phone and began arguing with the men. The three men then left the shop, followed by defendant, who got into the passenger side of a two-door, Pontiac Grand Am that was parked in front of the barbershop, facing west on 51st Street. The car pulled out, and a few minutes later, Coleman heard gun shots and looked outside. Coleman saw defendant in the Grand Am with his hand out the window, holding a gun and shooting in the direction of Racine Avenue. Coleman indicated in her statement that she was treated well by the police and Assistant State's Attorney Palermo, that no threats or promises had been made to her, and that she was giving her statement freely and voluntarily. She also acknowledged that Palermo had read the entire statement out loud while she followed along and that she had been allowed to make corrections.

¶ 5        Defendant was interviewed by Chicago police officers and gave a handwritten statement confessing to the shooting. In his statement, defendant said he went to

Mr. B's to get a haircut around 5:45 p.m. on January 22, 1999. Once there, he saw his "associate," Marcus Carpenter, driving a two-door, black car and waved him down. Carpenter made a U-turn and parked in front of the barbershop on 51st street, facing west. Defendant entered the barbershop, exchanged a few words with Coleman, and then called his girlfriend from the pay phone. While on the phone, Carpenter came in, and they talked.

¶ 6        Defendant stated that he then saw two men he knew as Rasou and Banks enter the barbershop. Rasou approached defendant and started talking about a shooting involving defendant's brother that had happened earlier that day next to the barbershop. They then began arguing, and defendant got off the phone. Rasou and Banks left, and shortly thereafter he and Carpenter followed. Carpenter got into the driver's seat of his car and defendant into the passenger seat. At this time, Rasou was standing in front of a restaurant immediately west of the barbershop, and Banks was by a convenience store at the corner of 51st Street and Racine Avenue. According to defendant, Carpenter gave him a gun. Defendant then rolled down the window, and as Carpenter started to drive away, defendant stuck the gun out the window and fired three shots at Rasou. As they drove past Banks, defendant fired two shots. Defendant stated he did not see either Rasou or Banks with a gun. After driving away, defendant got out of Carpenter's car and went to his girlfriend's house.

¶ 7        In his statement, defendant indicated that he saw three women near the convenience store when he started shooting but that he was not trying to kill anyone. Defendant also stated he was treated well by the police and assistant state's attorney, that no promises or threats were made, and that he was giving the statement freely and voluntarily.

¶ 8        Prior to trial, defendant filed a motion to suppress, alleging that his inculpatory statement was the result of physical coercion by Chicago Police Detectives John Murray and James O'Brien. Defendant asserted that the detectives slapped and yelled at him, threatened him, and cut or sliced his fingernails.

¶ 9        At a suppression hearing held on April 29, 1999, Detective Murray testified that he, along with his partner O'Brien, arrested defendant at approximately 9:30 p.m. on January 23, 1999. According to Murray, defendant was transported to Area 1

police headquarters, placed in an interview room, and was not handcuffed at any time while in the room.

¶ 10       At 10 p.m., Murray and Detective John Halloran interviewed defendant. According to Murray, defendant was given *Miranda* warnings at this time. See *Miranda v. Arizona*, 384 U.S. 436 (1966). After defendant provided an alibi involving his girlfriend, the detectives left to interview her.

¶ 11       At approximately 11:15 p.m., Murray again interviewed defendant, this time with O'Brien. During this interview, defendant implicated himself in the murder. Murray then contacted the Cook County State's Attorney's Office. At approximately 12:45 a.m. on January 24, 1999, Assistant State's Attorney Palermo and Murray interviewed defendant. At the end of this interview, defendant chose to have Palermo handwrite his statement. At 3 a.m., defendant gave his statement to Palermo. At the end of the statement, defendant was asked how he was treated, and he stated he was treated well by both the police and Palermo, that no threats or promises had been made, and that he was giving the statement freely and voluntarily. To Murray's knowledge, no detective ever slapped defendant, yelled at him, threatened him in any way, or sliced his fingernails.

¶ 12       Defendant did not testify at the hearing on the motion to suppress, nor did his attorney offer any other evidence in support of the motion. When asked by the court whether he was waiving opening argument, counsel stated, "I am waiving everything." The court then found the State had disproved each of the allegations made in the motion to suppress and concluded defendant's statement was made voluntarily. Accordingly, the court denied defendant's motion.

¶ 13       Defendant's case proceeded to a jury trial on June 22, 2000. While testifying for the State, Tara Coleman recanted her prior written statement. Coleman claimed that, while being interviewed by the police, they had struck her with pens and her statement had not been freely given. Coleman also recanted her grand jury testimony, during which she had confirmed the accuracy and truth of her written statement. In her trial testimony, Coleman denied seeing who the shooter was and denied identifying defendant as the shooter. Coleman was impeached by her written statement, which was published to the jury.

¶ 14    The State also offered the testimony of Detective O'Brien, who testified that Coleman identified defendant as the shooter in her statement, identified defendant in a photo array, and identified defendant in a show up. O'Brien further testified that he was present when Assistant State's Attorney Palermo reduced Coleman's statement to writing and that Palermo reviewed the entire statement with Coleman, who then initialed certain changes and signed the document. O'Brien denied that he or any other officer made threats to Coleman or that they struck her with pens.

¶ 15    Assistant State's Attorney Palermo also testified. She stated that, prior to taking Coleman's handwritten statement, she and O'Brien had interviewed Coleman. After that, she asked O'Brien to leave the room and then asked Coleman how she had been treated. Coleman stated she had been treated "fine." Palermo then took the handwritten statement and reviewed it, page by page, reading it aloud. Coleman was allowed to make changes and then initialed and signed the statement.

¶ 16    Detectives O'Brien and Halloran and Assistant State's Attorney Palermo also testified regarding the circumstances surrounding defendant's interrogation and statement. The witnesses all testified that defendant indicated he was treated well and that his statement was freely given.

¶ 17    Nikki Goodman testified on behalf of defendant. She stated that on the evening of January 22, 1999, she saw Rasou standing in the middle of the intersection of 51st Street and Racine Avenue, firing a gun "like crazy." Defendant, who was in a car, returned fire and drove away. According to Goodman, Rasou was still shooting at defendant as he pulled away.

¶ 18    On cross-examination, Goodman stated she did not know how many shots were fired by either defendant or Rasou and that she really did not see who fired first. Additionally, she admitted that in a sworn statement given on June 19, 1999, she stated defendant fired first. Goodman admitted she never spoke with police investigators and that she had briefly dated defendant in the past.

¶ 19    Defendant testified on his own behalf. He stated that, at approximately 5:30 p.m. on January 22, 1999, he went to Mr. B's to get a haircut. As he was entering the barbershop, he saw Carpenter driving by and flagged him down. Defendant went into the barbershop and saw Coleman. They spoke and hugged, and defendant

then proceeded to use the pay phone. While defendant was on the phone, Carpenter came in.

¶ 20 A bit later, Rasou and Banks entered the barbershop. Rasou asked defendant what he "ha[d] to say or do with the shooting that happened earlier," in which defendant's brother was involved. Defendant told Rasou that so long as no one did anything to his family (*i.e.*, his brother), he had nothing to do with the incident. Rasou then stated, "I'm going to kill you and that bitch ass nigger." Carpenter told defendant he had seen Banks with a gun. Rasou and Banks then left, followed by defendant and Carpenter.

¶ 21 Carpenter then took defendant to get his car. Defendant then returned to the area and parked across from the barbershop. Defendant saw Rasou making his way toward him and had a "vibe" something was going to happen, so he started to pull away. As he did so, Rasou fired four to seven shots at him. Defendant testified that he feared for his life, so he fired back two shots. Defendant stated he had the gun because he had been shot 14 times in an incident two years earlier.

¶ 22 Defendant testified that he spoke with the police but did not tell them the same story he had just told the jury because they "pursued" him to say what they wanted to hear. After the police told him what Tara Coleman had said, he told the story that the assistant state's attorney wrote down. Defendant stated that he never saw the victim, did not shoot at her, and only intended to shoot at Rasou.

¶ 23 On cross-examination, defendant admitted that he confessed to the shooting in his written statement, but he maintained that the statement was not accurate. According to defendant, when the police confronted him with the statements of Coleman and others, he told the police and Palermo what he had just testified to the jury. However, Palermo said she did not believe him. So, according to defendant, he told the story that was included in the handwritten statement, which according to defendant was the only story his interrogators would believe. Defendant repeated that he told Palermo the correct story but that Palermo said he was lying and would not put that information in his statement. Defendant testified that he did not pursue the issue after that and did not bring it up when they reviewed the statement. Defendant testified that he made up the statement that Carpenter gave him a gun because that was what the police and Palermo wanted to hear. When asked whether

anyone had threatened defendant to say anything in his statement, defendant answered, "No, sir."

¶ 24    In rebuttal, the State recalled Assistant State's Attorney Palermo. She testified that defendant never said anything about shooting in self-defense, that she never told him he was lying or that she did not believe his story, and that he never mentioned anything about anyone else having a gun.

¶ 25    The jury thereafter found defendant guilty of first degree murder, and the trial court sentenced him to 40 years' imprisonment. Defendant subsequently filed a motion for a new trial, alleging, among other things, that the trial court erred in denying his motion to suppress. This motion was denied.

¶ 26    Defendant appealed, arguing, in part, that the trial court erred in refusing to instruct the jury on provocation. The appellate court affirmed. *People v. Blalock*, 1-00-2769 (2002) (unpublished order under Illinois Supreme Court Rule 23). Defendant's petition for leave to appeal to this court was denied. *People v. Blalock*, 202 Ill. 2d 619 (2002).

¶ 27    On July 10, 2003, defendant's retained counsel filed a postconviction petition alleging actual innocence based on newly discovered evidence. Attached to this petition was an affidavit from a prisoner who met defendant at Stateville Correctional Center and who stated that he could corroborate defendant's claim of self-defense. On September 2, 2003, the trial court summarily dismissed defendant's petition as frivolous and patently without merit. This order was not appealed.

¶ 28    On July 8, 2009, defendant filed a *pro se* motion for leave to file a successive postconviction petition, alleging ineffective assistance of postconviction counsel for failing to appeal the dismissal of his initial postconviction petition. On August 20, 2010, the State filed a motion to dismiss, arguing that the petition was without merit, that it was barred by waiver and *res judicata*, and that defendant could not establish cause and prejudice. The trial court denied defendant's motion for leave to file. The appellate court affirmed (*People v Blalock*, 2014 IL App (1st) 102685-U), and this court denied defendant's petition for leave to appeal (*People v Blalock*, No. 118294 (Ill. Nov. 26, 2014)).

¶ 29    On August 15, 2016, defendant filed the second successive postconviction petition at issue in this appeal. Relevant here, defendant alleges in the petition that newly discovered evidence of a pattern and practice of misconduct by Detectives Halloran, O'Brien, and Murray support his claim that his inculpatory statement was the result of police abuse and coercion. Defendant contends that his confession was involuntary and used as substantive evidence against him in violation of his constitutional rights.

¶ 30    Among other documents attached to his petition are an unsigned, unnotarized "affidavit" from defendant; a printout from the 2012 Torture Inquiry and Relief Commission (TIRC) database dated 1989 through 2002 asserting abuse by O'Brien and Halloran[1]; affidavits dated 2009, 2011, and 2011 from three individuals who assert that Halloran physically abused them during their interrogations in 1991, 1992, and 1994 (two of the affidavits also assert abuse by O'Brien); an affidavit dated 2000 in which the affiant alleges abuse by Halloran in that he denied him counsel; and copies of complaints filed with the Chicago Police Department Office of Professional Standards alleging that Halloran and O'Brien physically and verbally abused arrestees in 1992, 1993, and 1988. Defendant also details in the body of his petition various appellate court decisions and identifies 32 individuals who were subject to abuse or witnessed abuse or misconduct by Halloran and/or O'Brien between November 1988 and November 1998.

¶ 31    In his affidavit, defendant states that during his interrogation he denied any involvement in the shooting. Detective Halloran, however, told him he was going to spend the rest of his life in prison if Halloran did not kill him first. Halloran then choked defendant until he passed out. When he came to, defendant had urinated on himself. Halloran then pulled something silver from a keyring and split defendant's pinkie nail until it bled. Defendant was yelling, and Halloran told him to calm down. The officers then left. According to defendant, he lay down on a bench and put his T-shirt around his finger to slow the bleeding. When Halloran and O'Brien returned, defendant asked to see a doctor. They told him to start talking. Defendant again denied any involvement.

---

[1]The Illinois Torture Inquiry and Relief Commission was created by the Illinois Torture Inquiry and Relief Commission Act (775 ILCS 40/1 *et seq.* (West 2016)) to investigate claims that confessions were the result of police torture.

¶ 32    Defendant's affidavit states that he was then repeatedly hit, slapped, and kicked and that Halloran put his gun to defendant's head and threatened to kill him. Halloran then threatened to charge his brother, so defendant told the officers he would agree to say whatever they wanted him to say. He then gave a false statement. According to defendant, O'Brien told him to tell the assistant state's attorney he got a gun from Carpenter and shot out of the car window three times at Rasou and two times at Banks.

¶ 33    Defendant argued in his petition that, although he filed two prior postconviction petitions, his evidence of police abuse was newly discovered and, therefore, the factual basis of his abuse and coercion claim was not reasonably available to him during the prior postconviction proceedings. The circuit court denied defendant leave to file his successive petition, finding that he had failed to establish cause and prejudice as required by section 122-1(f) of the Post-Conviction Hearing Act (725 ILCS 5/122-1(f) (West 2016)).

¶ 34    The appellate court affirmed. 2020 IL App (1st) 170295. The appellate court concluded that the factual basis for defendant's coerced confession claim did not include the proffered evidence of police misconduct. Rather, the factual basis of defendant's claim consisted solely of his own knowledge of the abuse. And, since defendant "was obviously aware" of the fact that he was abused, his coercion claim could have been raised at any time. *Id.* ¶¶ 25-26. The appellate court concluded there was no objective factor that impeded defendant's ability to raise the claim of police coercion in his initial postconviction petition. *Id.* ¶ 26. As such, defendant failed to establish cause, and the circuit court properly denied him leave to file his petition. *Id.* ¶ 27.

¶ 35    We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). We also allowed the Innocence Project, the Roderick and Solange MacArthur Justice Center, and the Exoneration Project to file a brief *amici curiae* in support of defendant. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 36                                    ANALYSIS

¶ 37    The Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy for criminal defendants who have suffered substantial violations of their

constitutional rights at trial. *People v. Taliani*, 2021 IL 125891, ¶ 53. A postconviction proceeding is a collateral attack on a final judgment, and constitutional issues that were raised and decided on direct appeal are barred from postconviction consideration by the doctrine of *res judicata*, while issues that could have been raised, but were not, are forfeited. *Id.*

¶ 38     Both the Act and our caselaw make clear that the filing of only one postconviction petition is contemplated. *Id.* However, there are two exceptions where fundamental fairness requires that the bar against successive petitions be lifted. *Id.* ¶¶ 54-55. The first is the "cause and prejudice" exception, which has been codified in the Act (725 ILCS 5/122-1(f) (West 2016)). *Taliani*, 2021 IL 125891, ¶ 55. Under this exception, a defendant must demonstrate "cause" for the failure to raise a claim in the initial petition and that "prejudice" resulted from that failure. *People v. Lusby*, 2020 IL 124046, ¶ 27. The second exception is the " 'fundamental miscarriage of justice' " exception, which requires a petitioner to make a persuasive showing of " 'actual innocence' " (*Taliani*, 2021 IL 125891, ¶ 55) and does not require a showing of cause and prejudice (*id.* ¶ 58). Under either exception, a defendant must first obtain leave of court to file a successive petition. *Id.* The sole issue presented in this case is whether defendant should have been granted leave to file his successive petition because he satisfied the cause and prejudice standard. Our review of this issue is *de novo*. *Lusby*, 2020 IL 124046, ¶ 27.

¶ 39     The Act states that a defendant may establish "cause" "by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2016). What constitutes cause will necessarily depend on the unique circumstances of each case. However, this court has observed " ' "that a showing that the factual or legal basis for a claim was not reasonably available to counsel' ' " will constitute cause. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002) (quoting *Strickler v. Greene*, 527 U.S. 263, 383 n.24 (1999), quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Relying on this principle, defendant contends he made a showing of cause here.

¶ 40     Defendant maintains that the pattern and practice evidence he submitted with his postconviction petition, including the TIRC database, the affidavits from other alleged victims of abuse by the detectives at issue, and the complaints made to the Office of Professional Standards, did not exist during his initial postconviction

proceedings in 2003 or even when he filed his second postconviction petition in 2009. Further, according to defendant, the unavailability of this evidence impeded his ability to raise his claim. Defendant thus contends that, because the factual basis for his assertion that the police officers who interrogated him engaged in a pattern and practice of police brutality was not reasonably available to him prior to the time he filed his successive postconviction petition in 2016, he has established cause.

¶ 41　　　　The appellate court rejected this contention, holding that the factual basis of defendant's claim was simply his own personal knowledge of the alleged police brutality. The appellate court thus reasoned that, since the factual basis of defendant's claim was available to him from the time of his interrogation, his claim of police coercion could have been brought at any time. Thus, according to the appellate court, no objective factor impeded his ability to raise the claim during his initial postconviction proceedings. Stated otherwise, the rule adopted by the appellate court is that the factual basis of a claim of a coerced confession is always known to a defendant, that subsequent evidence of police misconduct is irrelevant to establishing cause, and a coerced confession claim can therefore never be raised in a successive postconviction petition. We disagree.

¶ 42　　　　The appellate court decision here is an outlier. The majority of appellate court panels to have considered the issue have concluded that newly discovered evidence of police coercion may, depending on the individual circumstances of the case, provide cause for permitting the filing of a successive postconviction petition. Representative of these decisions is *People v. Brandon*, 2021 IL App (1st) 172411.

¶ 43　　　　In *Brandon*, the defendant filed a pretrial motion to suppress, alleging physical abuse by the police. *Id.* ¶ 18. This motion was denied. *Id.* ¶ 25. The defendant did not raise this claim on direct appeal. *Id.* ¶ 26. In 2001, the defendant filed a *pro se* postconviction petition challenging his sentence, which was summarily dismissed. *Id.* ¶ 28. In 2010, the defendant filed a second postconviction petition, alleging police abuse and attaching new evidence, including the 2006 Report of the Special State's Attorney.[2] *Id.* ¶¶ 29-30. This petition was denied and affirmed on appeal

------

[2]This report found proof beyond a reasonable doubt that Jon Burge and police officers under his command at Areas 2 and 3 had engaged in widespread and systemic torture of criminal suspects in the 1980s and early 1990s.

because the police officers who interviewed the defendant were not named in that report. *Id.* ¶ 31. In 2017, the defendant filed a second successive postconviction petition, again alleging physical coercion. *Id.* ¶ 33. At this time, the defendant attached evidence with respect to the two officers involved with his interrogation, including three affidavits of other alleged victims, a federal civil rights complaint, and pre-2000 printouts of complaint register histories of the two officers. *Id.* ¶¶ 33-34. The circuit court denied the petition, finding that it was barred by *res judicata* and that it was frivolous and patently without merit. *Id.* ¶ 36. The appellate court reversed and remanded. *Id.* ¶ 109.

¶ 44    The court explained its basis for finding cause existed:

"It is through no fault of his own that a defendant does not have immediate access to evidence of a broader pattern of similar abuse inflicted on others by the accused officers. This evidence pertains to the conduct of the State's own agents, toward unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question, the accused officers themselves, have every incentive to remain mum, if not to deny everything. And even the most diligent investigation of a defendant's own case will not reveal to him *who else* may have been abused by the same officers when they were interrogated in *their own* cases.

Uncovering that information is, of course, usually a herculean task for the defense. But the more important point is that this information generally has nothing to do with the facts of the defendant's own case. Thus, investigating the defendant's own case, as diligent counsel is required to do, will not uncover this information. [Citations.]

In other words, the evidence a defendant needs to corroborate a claim of police abuse is as 'external to the defense' as it could possibly be, and the barriers to obtaining it are entirely 'objective'—that is, not of the defense's own making. [Citation.] So, the defendant cannot be faulted for lacking this evidence at the start, and if it becomes available to him later, he may use it then in a successive petition. There is cause for his 'failure' (so to speak) to find and use this pattern-and-practice evidence earlier." *Id.* ¶¶ 57-59.

¶ 45    The court concluded that "back in 2001, defendant did not possess, and could not reasonably have been expected to obtain, evidence of this pattern and practice of abuse at the hands of the detectives who secured his confession. He thus lacked any record to raise this claim in 2001." *Id.* ¶ 65. As such, the court found that the "complete absence of this new, relevant evidence in 2001 provides cause for defendant's 'failure to bring the claim in his *** initial post-conviction proceedings.' " *Id.* ¶ 69 (quoting 725 ILCS 5/122-1(f) (West 2018)). Other appellate decisions have similarly concluded that evidence of a pattern and practice of police misconduct is part of the factual basis of a coerced confession claim and that its prior unavailability establishes cause. See, *e.g.*, *People v. Jackson*, 2018 IL App (1st) 171773, ¶ 81; *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 14; *People v. Mitchell*, 2012 IL App (1st) 100907, ¶¶ 60, 63; see also *People v. Wrice*, 406 Ill. App. 3d 43, 52 (2010) (cause established when the defendant raised for the first time the argument that the report of the special state's attorney corroborated his claim of torture), *aff'd*, 2012 IL 111860, ¶ 49 (noting that the State conceded the showing of cause).

¶ 46    The appellate court below, in rejecting the reasoning found in cases such as *Brandon*, both ignored the realities of raising a coerced confession claim and adopted a rule that leads to absurd results. Consider, for example, a situation where, many years after a defendant's trial, the State concedes that defendant's confession was coerced. Under the rule adopted by the appellate court here, this concession would not form any part of the factual basis of the defendant's claim and, thus, could not be used to establish cause. In other words, under the appellate court's rule, even conclusive evidence that a confession was coerced, presented to a postconviction court immediately upon its discovery, cannot amount to cause. We do not believe the legislature intended such a result. *People v. Fort*, 2017 IL 118966, ¶ 35 (courts must "presume that the legislature did not intend unjust consequences").

¶ 47    Although we reject the rule adopted by the appellate court regarding cause, we nevertheless affirm the judgment of the appellate court because defendant has failed to establish prejudice. To establish prejudice, a defendant must show that the claim not raised during the initial proceeding so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f) (West 2014); *Lusby*, 2020 IL 124046, ¶ 27. Defendant has not met this standard.

¶ 48    At the pleading stage for motions for leave to file, all well-pleaded allegations in the petition and supporting affidavits are to be taken as true, but not when positively rebutted by the trial record. *People v. Robinson*, 2020 IL 123849, ¶ 45. Based on this principle, this court has "consistently upheld the dismissal of a postconviction petition when the allegations are contradicted by the record from the original trial proceedings." *People v. Torres*, 228 Ill. 2d 382, 394 (2008); see also *People v. Deloney*, 341 Ill. App. 3d 621, 629 (2003) (affirming dismissal where defendant's claim of police coercion was contradicted by the defendant's trial testimony denying that he was interrogated by the accused officers); see also *People v. Smith*, 2014 IL 115946, ¶ 35 ("leave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings").

¶ 49    Defendant alleges in his postconviction petition that, during his interrogation, he was choked until he passed out, urinated on himself, and had his pinky split open and a gun put to his head. However, at trial, defendant explicitly stated that no one threatened him to make his statement. Instead, defendant testified that he fabricated his statement merely to appease the detectives and assistant state's attorney because they would not accept his version of events. Defendant also testified he was left alone with the assistant state's attorney and was asked how he had been treated, to which he responded that he had been treated well. Defendant's trial testimony made it clear he allegedly fabricated his statement to appease the detectives and assistant state's attorney, not because of physical abuse. Defendant's trial testimony contradicts the allegations contained in the postconviction petition that his confession was the result of abuse. Because defendant's allegations of police coercion are directly contradicted by his sworn trial testimony, defendant failed to make a showing of prejudice, and the appellate court correctly affirmed the circuit court's judgment denying leave to file the second successive petition.

¶ 50                                     CONCLUSION

¶ 51    For the foregoing reasons, the judgment of the appellate court, which affirmed the judgment of circuit court, is affirmed.

¶ 52    Judgments affirmed.

¶ 53    JUSTICES NEVILLE and HOLDER WHITE took no part in the consideration or decision of this case.