NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230211-U

NO. 4-23-0211

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 3, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Calhoun County |
| TIMOTHY W. LONG, | ) | No. 14CF43 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra L. Wellborn, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Turner and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant's successive postconviction petition failed to make a substantial showing of actual innocence.

(2) Defendant's successive postconviction petition failed to make a substantial showing of ineffective assistance of trial counsel.

(3) Defendant failed to establish that he received unreasonable assistance from his postconviction counsel.

¶ 2    Defendant, Timothy W. Long, appeals the trial court's dismissal of his successive postconviction petition. He argues the court's ruling was in error because his petition made a substantial showing of both actual innocence and that his trial counsel was ineffective for failing to call exculpatory witnesses on his behalf. Alternatively, defendant argues he did not receive reasonable assistance from his postconviction counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In April 2015, the State filed a second amended information charging defendant with methamphetamine conspiracy (720 ILCS 646/65(a) (West 2012)). The charge was based on allegations that in November 2014, defendant and Michael Blumenberg agreed to manufacture methamphetamine. The State asserted that in furtherance of that agreement, defendant delivered Coleman fuel, a methamphetamine manufacturing ingredient, to Blumenberg, resulting in the manufacture of between 400 and 900 grams of methamphetamine.

¶ 5        In May 2015, defendant's jury trial was conducted. The State's evidence showed that on November 26, 2014, the police executed a search warrant at the residence of Dennis Burge where they discovered a "shake[-]and[-]bake meth lab"; methamphetamine manufacturing materials, including Coleman fuel; and a total of 686.7 grams of methamphetamine in three separate containers. Both Burge and Blumenberg were present at the time of the search and arrested.

¶ 6        In December 2014, defendant was interviewed by the police. The interview was recorded, and portions of the recording were played for the jury. During the interview, defendant admitted that he gave Blumenberg a can of Coleman fuel on the day the search warrant was executed. He also acknowledged using methamphetamine in the past, previously purchasing methamphetamine from Blumenberg, and being aware that Burge and Blumenberg had been manufacturing methamphetamine. Evidence showed that although the interviewing officer did not ask defendant why he brought Coleman fuel to Blumenberg, the officer did tell defendant that he was being charged with providing Coleman fuel for "meth purposes." According to the officer, defendant never asserted that he gave the Coleman fuel to Blumenberg for cooking or heating purposes.

¶ 7        At trial, the State also presented testimony from Blumenberg, who was then an

inmate in the Illinois Department of Corrections (DOC). Blumenberg testified he was originally charged with manufacturing and possessing methamphetamine. However, in exchange for agreeing to provide a statement to the police regarding the underlying events, the manufacturing charge was dismissed, he pleaded guilty to an amended possession charge, and he was sentenced to six years in prison.

¶ 8 Regarding the offense at issue, Blumenberg testified that a day or two before his arrest on November 26, 2014, defendant and Roy Connell went to Burge's residence while only Blumenberg was present "to get some dope." Defendant stated he "had just *** made some dope" but was out and wanted to buy more. Blumenberg sold dope to both defendant and Connell and discussed with them that he and Burge were planning to make more methamphetamine but were "waiting on a couple ingredients," including Coleman fuel. Blumenberg testified he told defendant that he and Burge did not have Coleman fuel and that it was one of the ingredients Burge was trying to acquire.

¶ 9 Blumenberg testified that the night before his November 26 arrest, he called defendant and told him that he "needed Coleman—[he] needed some fuel for [his] stove." During the call, Blumenberg spoke in code because he was high on dope and paranoid. The following day, defendant brought Blumenberg the Coleman fuel. The two men went inside Blumenberg's camper, which was near Burge's residence, and "smoked meth" or "ani-dope" that defendant possessed. Blumenberg testified that a container of Coleman fuel that was found inside Burge's residence was given to him by defendant.

¶ 10 On cross-examination, Blumenberg acknowledged that he had a Coleman stove inside his camper. However, he denied using the stove or knowing if it worked. He also testified that he called defendant both the night before his arrest and the following morning "to make sure

[defendant] was still coming."

¶ 11    The State further presented testimony from Joseph Gettings. Gettings testified that in 2001, he was charged with intent to manufacture methamphetamine following an incident that involved defendant. He recalled that, at some point, defendant gave him "a list of what was needed to make meth" so they could acquire those ingredients. Ultimately, defendant, Gettings, and "a couple ladies" were stopped by the police while in Gettings's car. During the stop, the police found methamphetamine manufacturing materials, including Coleman fuel that defendant had provided.

¶ 12    As part of his defense, defendant presented testimony from Blumenberg's brother, Jeffrey, who stated Blumenberg owned a Coleman stove that he kept in his camper; however, he also acknowledged that he had never observed Blumenberg use the stove. Defendant also called Sherrie Brandi Kieffer as a witness. Kieffer was dating Burge in November 2014, and stated she was at Burge's residence on November 26 but did not observe defendant.

¶ 13    Defendant further testified on his own behalf. He acknowledged giving Blumenberg a can of Coleman fuel but denied that it was for the purpose of manufacturing methamphetamine. According to defendant, he was working outside in his shed on November 25 when Blumenberg visited with a friend. Blumenberg told defendant he was out of money and asked if he could use a can of Coleman fuel that was in defendant's shed "for his stove." Defendant asserted he gave the can to Blumenberg, but Blumenberg forgot to take it when he left. The following morning, Blumenberg called defendant, who put the call "on speaker phone." Blumenberg asked if defendant still had the can of Coleman fuel, stated he needed the fuel for his stove, and asserted he "was going to be cooking on the Coleman stove." Defendant delivered the can of Coleman fuel to Blumenberg the same morning. However, he denied that he smoked methamphetamine with Blumenberg or that Blumenberg told him he was going to use the Coleman

fuel to "cook" methamphetamine.

¶ 14      Defendant maintained Roy Connell was present at his residence when Blumenberg called and heard their conversation. Although the defense called Roy as a witness, he did not testify, as he was facing criminal charges in connection with the same factual circumstances as defendant and elected to invoke his fifth amendment (U.S. Const., amend. V) privilege against self-incrimination.

¶ 15      On cross-examination, defendant testified he had known Blumenberg most of his life. He admitted smoking methamphetamine with Blumenberg and Roy Connell on November 25 at Burge's residence and that he paid Blumenberg $25. Defendant acknowledged that he had "heard rumors" that Burge was making methamphetamine and asserted he advised Blumenberg not to hang around Burge because of those activities. He admitted telling the police that Roy received a text from someone saying Burge and Blumenberg "cooked a turkey," which he stated was code for having made methamphetamine. Specifically, defendant recalled that Roy stated "his girlfriend had received [the] text." Defendant also agreed that Blumenberg told him that Burge wanted to make "another batch." He stated that he knew how to make methamphetamine and that the ingredients included pseudoephedrine, anhydrous ammonia, drain cleaner, and Coleman fuel. Finally, defendant testified he had previously been convicted of burglary, manufacturing methamphetamine, and possession of anhydrous ammonia.

¶ 16      The jury found defendant guilty of the charged offense. In August 2015, the trial court sentenced defendant to 30 years in prison. Defendant filed a direct appeal, raising multiple challenges to the underlying proceedings. Ultimately, this court reduced the degree of the offense of which defendant was convicted and remanded for a new sentencing hearing, finding the State's evidence established that only 100 to 400 grams of methamphetamine was attributable to the

conspiracy involving defendant instead of the 400 to 900 grams charged by the State. *People v. Long*, 2018 IL App (4th) 150919, ¶ 44, 115 N.E. 3d 295.

¶ 17 On remand, the trial court appointed attorney Donald Schaaf to represent defendant for resentencing purposes and ordered an updated presentence investigation report (PSI). In May 2019, defendant's supplemental PSI was filed. Accompanying that report was a handwritten version of events authored by defendant, in which he asserted his innocence and alleged his trial counsel was ineffective for failing to call certain witnesses to contradict the State's evidence at trial. Defendant maintained that he had multiple affidavits that "show[ed] the truth." He also claimed to have filed a postconviction petition in October 2018 and asserted he was waiting for the appointment of counsel in connection with that petition and for "a court date to be set to hear the evidence." The appellate record fails to reflect the filing of such a petition.

¶ 18 In June 2019, the trial court conducted a new sentencing hearing and resentenced defendant to 30 years in prison. At the conclusion of the hearing, defendant indicated his desire to file a motion for reconsideration of his sentence and asked the court to appoint counsel for him. Again, he also represented that he had filed a postconviction petition in October 2018, and he was "waiting on a court date or something on that." The record shows the court, again, appointed Schaaf to assist defendant with his postsentencing matters, "including the pending post[ ]conviction petition."

¶ 19 In July 2019, defendant, with Schaaf's aid, filed a motion to reconsider his sentence. Following a hearing in August 2019, the trial court denied the motion. Defendant appealed, arguing, in part, that his sentence was excessive. This court agreed, reducing defendant's sentence to 20 years in prison pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967). *People v. Long*, 2020 IL App (4th) 190759-U, ¶ 36.

¶ 20       The same day the trial court denied defendant's motion to reconsider his sentence, defendant filed a nine-page, *pro se* postconviction petition. He alleged he received ineffective assistance of counsel due to his counsel's failure to present testimony from Burge and Roy Connell, improper examination of witnesses, and failure to object to improper other-crimes evidence and instances of prosecutorial misconduct. Defendant also asserted he was denied his right to a fair trial as a result of the prosecutor's misconduct and the admission of highly prejudicial other-crimes evidence. Defendant's petition was not accompanied by any attachments.

¶ 21       In October 2019, the trial court entered a written order, summarily dismissing defendant's postconviction petition. It found defendant had already raised each of his claims on direct appeal and, as a result, they were barred by *res judicata*.

¶ 22       Defendant appealed the trial court's dismissal of his postconviction petition, arguing he was denied his right to the reasonable assistance of postconviction counsel. *People v. Long*, 2020 IL App (4th) 200055-U, ¶ 2. He asserted "the trial court appointed counsel to assist him with his postconviction petition and, although he clearly expressed a desire to raise specific postconviction claims and asserted he had affidavits to support those claims, his counsel 'filed a petition with no affidavits attached that was frivolous on its face.' " *Id.* ¶ 11. This court disagreed, finding the trial court appointed counsel to represent defendant only with postsentencing matters and a "pending" postconviction petition that had never actually been filed, not "to represent defendant in postconviction proceedings generally." *Id.* ¶ 15. We found no indication in the record that the trial court had intended "to make a first-stage appointment of counsel" and that it was instead "clearly acting under the mistaken impression that defendant had filed a postconviction petition that had remained pending for several months and was required to be docketed for second-stage proceedings." *Id.* ¶ 17. We determined that Schaaf, defendant's appointed counsel,

was under no obligation to represent defendant in connection with initiating a new postconviction proceeding and, thus, could not be said to have provided an unreasonable level of assistance with respect to defendant's August 2019 postconviction petition, which we noted was handwritten, labeled as a *pro se* petition, and did not bear Schaaf's name or signature. *Id.* ¶¶ 18-19.

¶ 23    In February 2021, defendant initiated the proceedings that are at issue on appeal by filing a *pro se* motion for leave to file a successive postconviction petition. He stated his desire to raise claims of (1) actual innocence and (2) ineffective assistance of counsel based on his trial counsel's failure to call certain witnesses in his defense. Defendant argued that he should be allowed to raise his claims in a successive petition because of " 'fundamental deficiencies' " in the proceedings on his initial postconviction petition, filed in August 2019.

¶ 24    Defendant stated his actual-innocence claim was based on information contained in affidavits he obtained from Burge and Roy Connell, which showed he "was not involved in the conspiracy to make methamphetamine." He maintained the evidence was newly discovered because during his trial, he was unable to contact Burge due to his incarceration and Roy invoked his fifth amendment privilege against self-incrimination. Defendant's ineffective-assistance claim was based on his trial counsel's failure to call witnesses in his defense at trial, including Burge, Roy Connell, Kyle Connell, Tamie Cawthon, and Angela Mundy. He maintained he had affidavits from the witnesses to support his claims and that all of the witnesses were known to his counsel and available at the time of his trial.

¶ 25    Defendant asserted that the reason the affidavits he was relying upon were not submitted with his August 2019 postconviction petition was because Shaaf performed deficiently. Defendant alleged that on October 17, 2018, he attempted to file a 40-page postconviction petition. He alleged he mailed two copies and there was "no question that [his mailing] was received by the

Calhoun Court House [*sic*]" because Schaaf later informed him in a letter dated July 1, 2019, that the state's attorney had given Schaaf a copy of the petition that defendant sent.

¶ 26        Defendant further alleged that when Schaaf was appointed as his counsel during his resentencing proceedings, he told Schaaf about the postconviction petition he filed in October 2018 and "showed him all supporting affidavits." According to defendant, Schaaf looked over the petition and affidavits and stated he would help defendant "if appointed to." Defendant pointed out that Schaaf was appointed to represent him following his resentencing. He maintained that instead of filing the petition and affidavits he and defendant reviewed in April 2019, Schaaf filed a postconviction petition that consisted of "some [nine] pages of frivolous material that was given to him by the State and didn't include any of [defendant's] affidavits or supporting evidence." Defendant suggested that the 9-page postconviction petition that was filed in August 2019 was only a portion of the 40-page petition he attempted to file in October 2018.

¶ 27        To his motion for leave to file a successive postconviction petition, defendant attached what he alleged was his full, original *pro se* petition that he attempted to file in October 2018, which he stated was revised with 18 pages of new material and all affidavits and supporting materials attached. Relevant to this appeal, defendant's petition contained references to the affidavits of his named witnesses along with arguments that the affidavits were newly discovered and that they would show he was not culpable for the charged offense. Defendant also claimed his trial counsel was ineffective for failing to present testimony from the same witnesses at trial and that he suffered prejudice as a result.

¶ 28        Attachments to defendant's petition included DOC forms indicating that in October 2018, he authorized payments from his trust fund account in the amounts of (1) $3.52 for postage for a postconviction petition and (2) $4 for "legal copies." He also attached a letter dated July 1,

2019, and authored by Schaaf, which stated as follows:

"Please find herewith a Motion to Reconsider Sentencing pertaining to the June 5, 2019[,] sentencing. This is the first step. If this does not change, we will check take [*sic*] next step of filing post-conviction motions. The State's Attorney gave me a copy of the one you sent him, as the County Clerk did not have one on file. At that later time, we will also ask the court about time to meet to discuss this case in person."

Defendant's attachments also included his own affidavit; affidavits from his alleged witnesses— Burge, Roy and Kyle Connell, Mundy, and Cawthon; and the affidavit of Gilbert C. Lenz, his previous appellate counsel.

¶ 29        In his affidavit, dated April 20, 2018, Burge acknowledged that he and Blumenberg were arrested on November 26, 2014, for "manufacturing meth" at Burge's residence. He noted the police found one "active shake and bake meth cook bottle" and two old bottles "from previous cooks." Burge stated that at the end of his previous cooks, he had run out of Coleman fuel and needed to find more. On November 25, he and Blumenberg went to Kieffer's residence. According to Burge, Blumenberg used Kieffer's phone, stating he was calling defendant. Burge listened as Blumenberg made the call and heard him say "that he needed some Coleman fuel for the Coleman stove." Burge averred that on November 26, Blumenberg showed up at his residence with some Coleman fuel that he said came from defendant. They "then proceeded to start cooking." Burge further maintained that defendant "didn't have anything to do with what [he and Blumenberg] were doing that day, nor did he have anything to do with anything [Burge and Blumenberg] had done in the past." Finally, he stated that if defendant "had been at [his] house a day or two before," defendant "would not have seen any evidence of a meth lab as [Burge] did not leave things out in

- 10 -

the open at [his] house."

¶ 30         Defendant submitted two affidavits from Roy Connell. The first affidavit, dated November 14, 2016, showed that on the morning of November 26, 2014, Roy visited defendant and joined him in his kitchen when defendant received a phone call that he put on "speaker phone." Roy recognized Blumenberg as the caller. Blumenberg, who sounded "extremely agitated" and intoxicated, stated he was "getting his power shut off soon and asked [defendant] if he possibly had any fuel for his portable stove so he could still prepare food upon losing his electrical service." Roy stated both he and defendant were aware that Blumenberg possessed such a stove. According to Roy, defendant responded that he would "check around their farm and the conversation ended." He also asserted that both he and defendant "avoided *** Blumenberg at all costs and were little more than acquaintances from high school" with him.

¶ 31         In his second affidavit, dated May 22, 2018, Roy asserted that prior to the underlying offense, he spent "most everyday working, and hanging out with [defendant]." He asserted that at no time did either he or defendant receive a text message from Blumenberg or Burge that referenced "a Thanksgiving turkey being cooked by them." Instead, Blumenberg and Burge sent such a text to his ex-girlfriend, who "then let all of us know that she had received such a text." Roy further averred that he and defendant "had no dealings with" Blumenberg and Burge, denied that he and defendant had gone to Burge's residence and purchased methamphetamine, denied that he and defendant ever told Blumenberg or Burge that they had recently cooked methamphetamine, and denied that Blumenberg or Burge asked either him or defendant for Coleman fuel.

¶ 32         Roy's brother, Kyle Connell, provided an affidavit that was also dated May 22, 2018. Kyle asserted that he had known defendant for most of his life and "used various drugs with

him." He maintained that Blumenberg was known as a police informant and that defendant "would never have conspired with Blumenberg to commit any kind of crime." He also stated that defendant "had little to no dealings" with Blumenberg for nearly two decades.

¶ 33    Mundy's affidavit was dated January 6, 2017. She asserted she and defendant had been best friends for over 20 years. The two communicated daily, and Mundy never saw defendant in the presence of, or heard him speaking about, Blumenberg. According to Mundy, it was common knowledge that Blumenberg lived in a camper and cooked on a Coleman fuel stove. Mundy further stated that she was present for the events in November 2001 testified to by Gettings at defendant's trial. She maintained Gettings's testimony on the subject was false. Mundy asserted that Gettings asked her and defendant to ride to Carrollton, Illinois, with him and Georgina Branham, and that "at no time did [Gettings] ever ask for or receive a list of ingredients with which to manufacture methamphetamine." She stated that when the police stopped Gettings's car, they found ingredients for manufacturing methamphetamine and a list of ingredients in Branham's purse that was written in Branham's handwriting.

¶ 34    Cawthon's affidavit was dated March 6, 2017. Relevant to this appeal, she stated she had known defendant for over 15 years and was his girlfriend at the time of the underlying events. She maintained defendant "was not involved with Blumenberg in any way other than [as] an occasional acquaintance at the bars."

¶ 35    Finally, in his affidavit, Lenz stated he was an assistant appellate defender and represented defendant as appointed counsel in his three previous appeals. He asserted that during his representation of defendant, he had conversations with Schaaf that might be relevant to defendant's successive postconviction claims. In particular, he averred as follows:

        "On March 4, 2020, I spoke with Mr. Schaaf on the phone again while I was

working on [defendant's] appeal from re-sentencing and his appeal from the dismissal of his 2019 post-conviction petition. I noted that [defendant] had told me that in October 2018, he tried to file a post-conviction petition with affidavits attached, and I asked Mr. Schaaf what he knew about that petition and those affidavits. Mr. Schaaf told me the following:

After Schaaf was appointed to represent [defendant] on his post-conviction petition, [defendant] told Schaaf that he filed a post-conviction petition with affidavits in October 2018.

Schaaf asked the Clerk of the Circuit Court if she had that petition and she said she did not. The Clerk told him she did not know whether it was misplaced after it was received or whether it was never received.

In August 2019, Calhoun County State's Attorney Ringhausen told Schaaf that the State had received a post-conviction petition from [defendant] in October 2018. Ringhausen gave the petition to Schaaf, and Schaaf filed it in the Circuit Court the same day."

¶ 36    In April 2021, the trial court entered a written order, stating it had reviewed defendant's "subsequent" *pro se* postconviction petition and his attached affidavits. It appointed attorney Keisha Morris to represent him in connection with that petition.

¶ 37    In June 2021, the State filed a motion to dismiss defendant's petition. It argued that several of the claims of error raised by defendant were barred by *res judicata* because they were previously raised by defendant on appeal and addressed by this court. The State also asserted that Burge's statements in his affidavit did not refute any evidence presented at trial and that Roy's statements regarding the phone conversation he overheard were hearsay, and that the conversation

was testified to by both defendant and Blumenberg at trial.

¶ 38    The same month, attorney Morris was allowed to withdraw as defendant's counsel due to a conflict of interest. The trial court then appointed attorney Walker Filbert to represent defendant and granted Filbert leave to adopt defendant's *pro se* postconviction petition or to file his own petition on defendant's behalf. The State was also granted leave to modify its motion to dismiss.

¶ 39    Ultimately, the record fails to reflect that defendant filed any amended pleading; however, on defendant's behalf, Filbert filed a "Motion To Consolidate Affidavit Exhibits," asking the trial court to "consolidate and incorporate by reference into Defendant's Motion For Leave to File a Successive Post Conviction Petition (filed February 8, 2021) all of the affidavits attached to Defendant's Post Conviction Petition (also filed February 8, 2021)."

¶ 40    In July 2022, the State filed a new motion to dismiss defendant's successive postconviction petition. It argued *res judicata* and forfeiture barred all of defendant's claims. Again, the State noted that nearly all of the claims raised in defendant's petition had been previously addressed on appeal. It stated the only new claims raised concerned the affidavits from defendant's various witnesses—Burge, the Connells, Mundy, and Cawthon. However, the State pointed out that each affidavit was dated between 2016 and 2018, prior to the filing of defendant's initial postconviction petition in August 2019. Accordingly, it maintained that claims relating to those affidavits were forfeited. The State also argued that defendant's allegations failed to make a showing of either cause or prejudice related to his failure to raise his claims in his earlier postconviction petition or actual innocence. As to defendant's actual innocence claim, the State argued the affidavits of Burge and Roy Connell were cumulative of other evidence presented at defendant's trial and not of such conclusive character that they would change the result upon

retrial.

¶ 41        In September 2022, Filbert filed an amended certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). He asserted he had consulted with defendant by mail and phone to ascertain his contention of errors in connection with his motion for leave to file a successive postconviction petition, and had examined the trial court file and report of proceedings of defendant's trial, sentencing hearing, and "subsequent matters." Counsel also asserted as follows:

> "I have made only one amendment (Motion to Consolidate Affidavit Exhibits) to the pending motion necessary for the adequate presentation of any defects of prior proceedings. Defendant did not want any further amendments and wished to stand on his allegations."

¶ 42        The same day counsel filed his certificate, the trial court conducted a hearing on defendant's successive petition and dismissed it. Following the court's ruling, defendant asked to speak and complained that the court "never heard all the facts," that he was innocent, and that the testimony to prove his innocence was "not getting put on the record." He also complained of "a complete absence of consultation" with one of his previously appointed attorneys and stated he "just met [Filbert] a little bit ago." The court responded that it had made its ruling and adjourned the proceedings.

¶ 43        In October 2022, defendant, with Filbert's aid, filed a motion to reconsider the trial court's dismissal of his petition. The motion stated, in part, that defendant had provided Filbert "with documents to support [the] motion" and that Filbert would "supplement [the] motion after reviewing and compiling said documentation."

¶ 44        In January 2023, defendant filed a *pro se* motion for a *Krankel* hearing (see *People*

*v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)), alleging Filbert had not provided him with reasonable assistance and had "done nothing that [defendant] asked." Defendant complained that Filbert failed to investigate his claims by not contacting Burge or Roy; did not communicate with him "other than the day of court"; was confrontational and did not listen to what defendant had to tell him; failed to "file any of the arguments [defendant] gave him" in connection with his motion to reconsider; and did not revise defendant's petition or "lay[ ] out" defendant's actual innocence claim. The same month the trial court entered a written order, denying defendant's motion on the basis that "[a] *Krankel* hearing is not required in postconviction proceedings."

¶ 45        In February 2023, Filbert filed a supplement to defendant's motion to reconsider on defendant's behalf. He noted defendant had given him voluminous documents to potentially support the motion; however, his review of the documents showed they did not present any newly discovered evidence not previously known or any new laws pertaining to the issues before the court. Accordingly, he represented that the sole basis for defendant's motion was that the court "misapplied existing law especially as it relates to the affidavits."

¶ 46        The same month, the trial court entered a written order denying defendant's motion to reconsider. In so holding, it noted it had allowed the filing of defendant's successive postconviction petition, but that upon review of the pleadings and the State's arguments, it found "the claim was not newly discovered evidence, that it was cumulative and was evidence which was available at trial and at the earlier Post-Conviction filing."

¶ 47        This appeal followed.

¶ 48                                II. ANALYSIS

¶ 49        On appeal, defendant argues the trial court erred by dismissing his successive postconviction petition. He contends his petition made substantial showings that he was actually

innocent of the charged offense and that his trial counsel provided him with ineffective assistance for failing to present the testimony of exculpatory witnesses. He requests the appointment of new counsel and a third-stage evidentiary hearing on such claims. Alternatively, defendant argues Filbert, his postconviction counsel, failed to provide a reasonable level of assistance. Relative to that claim, he seeks remand for new second-stage postconviction proceedings.

¶ 50                                    A. Applicable Law

¶ 51            "The Post-Conviction Hearing Act [(Act)] provides a three-stage process for an imprisoned person to raise a constitutional challenge to a conviction or sentence." *People v. Hatter*, 2021 IL 125981, ¶ 22, 183 N.E.3d 136 (citing 725 ILCS 5/122-1 *et seq*. (West 2016)). Generally, the Act contemplates the filing of only a single postconviction petition. *People v. Dorsey*, 2021 IL 123010, ¶ 32, 183 N.E.3d 715. The filing of a successive postconviction petition is "highly disfavored" because it "plagues finality." (Internal quotation marks omitted.) *People v. Clark*, 2023 IL 127273, ¶ 39, 216 N.E.3d 855. Nevertheless, a defendant may file such a petition with leave of the circuit court in certain circumstances. *Id.*

¶ 52            In particular, there are "two exceptions where fundamental fairness requires that the bar against successive petitions be lifted." *People v. Blalock*, 2022 IL 126682, ¶ 38, 215 N.E.3d 118. First, under the "cause and prejudice" exception, "a defendant must demonstrate 'cause' for the failure to raise a claim in the initial petition and that 'prejudice' resulted from that failure." *Id.* "The second exception is the fundamental miscarriage of justice exception, which requires a petitioner to make a persuasive showing of actual innocence." (Internal quotation marks omitted.) *Id.* When the court allows a successive petition to be filed, "it advances to the three-stage process for evaluating postconviction petitions." *People v. Bailey*, 2017 IL 121450, ¶ 26, 102 N.E.3d 114.

¶ 53            At the first stage of postconviction proceedings, "the circuit court reviews the

petition independently within 90 days after it is filed and docketed." *Hatter*, 2021 IL 125981, ¶ 22. The court may summarily dismiss the petition at the first stage upon a finding that "it is 'frivolous or is patently without merit.' " *Id.* ¶ 23 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2016)).

¶ 54 A petition that is not summarily dismissed by the circuit court advances to the second stage, where the court may appoint counsel to represent the defendant and the State may file responsive pleadings. *People v. House*, 2021 IL 125124, ¶ 16, 185 N.E.3d 1234. At the second stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* ¶ 17.

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767.

A petition that makes a substantial showing of a constitutional violation is advanced for a third-stage evidentiary hearing, while one that does not is subject to dismissal. *House*, 2021 IL 125124, ¶ 17. Review of the second-stage dismissal of a postconviction petition is *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29, 124 N.E.3d 908.

¶ 55 In this case, defendant filed a motion for leave to file a successive postconviction petition along with his successive petition. The record reflects the court allowed the filing of the

petition and advanced it to the second stage of postconviction proceedings, where it was dismissed on the State's motion. Accordingly, we review the propriety of that second-stage dismissal.

¶ 56                                    B. Actual Innocence

¶ 57            As noted, defendant first argues that his successive postconviction petition made a substantial showing that he was actually innocent of the offense at issue—methamphetamine conspiracy. To support his claim, he points to the affidavits of Burge and Roy Connell, arguing the information in their affidavits constituted newly discovered evidence and supported his version of events "that he was unaware of the true purpose of the [Coleman] fuel and had nothing to do with the methamphetamine cook that occurred on November 26, 2014."

¶ 58            "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47, 181 N.E.3d 37. Newly discovered evidence means evidence that "was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617. Further, evidence is material when it "is relevant and probative of the [defendant's] innocence," and it is noncumulative if it "adds to what the jury heard." *Id.* Finally, "conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 59            "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than

certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 60      Here, defendant argues his allegations, based upon the affidavits of Burge and Roy Connell, meet all of the necessary requirements to establish a claim of actual innocence. The State responds by arguing that the evidence relied upon is cumulative in some respects of other evidence presented at defendant's trial and, ultimately, not conclusive. We agree with the State.

¶ 61      Defendant agrees that it is undisputed that he provided Coleman fuel to Blumenberg on November 26, 2014. He maintains, however, that the chief contested issue at his trial was whether he knew that the fuel would be used to manufacture methamphetamine or whether he believed Blumenberg intended to use the fuel for his "stove." Defendant argues that statements from Burge and Roy Connell were probative of his innocent intent and likely would change the result upon retrial. He first points to statements from Burge that he (1) "didn't have anything to do" with the methamphetamine cook on November 26 and (2) "would not have seen any evidence of a meth lab" when visiting Burge's residence prior to November 26.

¶ 62      We note that consistent with the above statements, the evidence at trial showed that although defendant provided Coleman fuel to Blumenberg, he was not at Burge's residence on November 26 and did not participate in the actual methamphetamine-making activities that occurred inside the residence on that date. Moreover, defendant was alleged to have conspired with Blumenberg regarding the manufacture of methamphetamine, not Burge. Even taking Burge's statements in his affidavit as true, they do not exclude the possibility of defendant agreeing to aid Blumenberg in the manufacturing of methamphetamine by providing a necessary ingredient. Finally, even if defendant would not have seen evidence of a methamphetamine lab when visiting Burge's residence immediately prior to November 26, both defendant's recorded statement to the

police and his trial testimony otherwise firmly established his knowledge that Blumenberg and Burge were involved in manufacturing methamphetamine. Contrary to defendant's arguments on appeal, Burge's statements were not exonerating of defendant, nor did they refute the State's evidence against him.

¶ 63    Next, defendant also relies on statements from one of Roy Connell's affidavits that (1) defendant never told either Blumenberg or Burge that he had recently cooked methamphetamine, (2) Blumenberg or Burge did not text defendant about "cooking a turkey," and (3) defendant never went to Burge's home to purchase methamphetamine. We find Roy's affidavit both cumulative of other evidence presented at trial and not conclusive.

¶ 64    First, in his affidavit, Roy provided the following information regarding a text about "cooking a turkey":

> "At no time ever did I, or [defendant] receive a text message from *** Blumenberg, or *** Burge referring to a [T]hanksgiving turkey being cooked by them… They did however send such a text to my ex-girlfriends phone *** who then let all of us know that she had received such a text."

We note that on cross-examination at his trial, defendant provided essentially the same information. He acknowledged previously telling the police that "Roy had gotten a text" that Blumenberg and Burge "had cooked a turkey, and that was actually code for having made meth." Defendant also testified that he "remembered Roy said, *** his girlfriend had received a text." Accordingly, Roy's statements regarding the text in his affidavit are cumulative of what was essentially undisputed evidence already presented at trial.

¶ 65    Second, as stated in our previous decision, the State presented strong evidence of defendant's guilt at trial.

"The undisputed evidence showed that defendant knew Coleman fuel was a methamphetamine manufacturing ingredient and that Blumenberg and Burge had been making methamphetamine. According to Blumenberg, shortly prior to November 26, 2014, defendant knew that Blumenberg and Burge intended to make more methamphetamine but were out of Coleman fuel and trying to obtain that ingredient. The undisputed evidence also showed that defendant delivered Coleman fuel to Blumenberg on November 26, 2014. That same day, Blumenberg 'cooked meth' at Burge's trailer. The police executed a search warrant and discovered methamphetamine near a half-empty container of Coleman fuel that Blumenberg testified was given to him by defendant." *Long*, 2018 IL App (4th) 150919, ¶ 55.

Roy's affidavit neither places the above evidence in a different light nor undermines our confidence in the judgment of guilt.

¶ 66    We note that although Roy's assertion that defendant never told either Blumenberg or Burge that he had recently cooked methamphetamine contradicts a statement by Blumenberg, whether or not defendant had actually made such a statement was not a significant component of the State's case. Additionally, the import of such a statement, *i.e.*, defendant's knowledge regarding how to manufacture methamphetamine and his recent involvement with the drug, was otherwise sufficiently established by other evidence in the case. Such evidence includes defendant's own statements regarding his recent use of the drug and admissions that he knew how to make it. Further, Roy's assertion that defendant never went to Burge's home to purchase methamphetamine contradicts not only Blumenberg's testimony, but is also refuted by defendant's own statements. During his recorded interview, defendant admitted purchasing methamphetamine from Blumenberg. Moreover, on cross-examination, he specifically acknowledged smoking

methamphetamine with Blumenberg and Roy on November 25 at Burge's residence and paying Blumenberg $25. Further, even if we were to ignore that some of the assertions in Roy's affidavit are directly contradicted by defendant's own admissions at trial, none of his statements refute Blumenberg's testimony that immediately prior to November 26, Blumenberg told defendant that he and Burge needed Coleman fuel to make more methamphetamine.

¶ 67     Ultimately, neither Burge's affidavit nor Roy's affidavit is of such conclusive character that they would probably change the result on retrial. Accordingly, defendant's petition failed to make a substantial showing of actual innocence.

¶ 68                    C. Ineffective Assistance of Trial Counsel

¶ 69     On appeal, defendant also argues that his successive postconviction petition made a substantial showing that his trial counsel provided ineffective assistance by not calling known exculpatory witnesses to testify at his trial. To support this claim, defendant points to the affidavits of Mundy, Kyle Connell, and Cawthon, which he argues would have refuted prejudicial testimony from Gettings that portrayed him as a methamphetamine producer and otherwise shown that he did not agree with Blumenberg to manufacture methamphetamine.

¶ 70     Initially, the State suggests defendant forfeited his ineffective-assistance claim because one basis for the trial court's dismissal of his successive petition was defendant's failure to establish cause under the cause-and-prejudice test, and defendant failed to challenge that basis in his appellant's brief. To support its contention, the State cites Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which provides that points not argued in an appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."

¶ 71     In response, defendant argues no forfeiture occurred because the trial court affirmatively found that he demonstrated both cause and prejudice when it granted him leave to

file his successive petition and appointed counsel to represent him. He also maintains that the court did not dismiss his successive petition on the grounds that he failed to meet the cause-and-prejudice test, but on the basis that the affidavits he relied upon were not newly discovered and cumulative.

¶ 72    First, to the extent defendant suggests the State could not seek dismissal of his successive petition based upon a failure to establish either cause or prejudice for his failure to previously raise his claims, we disagree. As the State points out, during the three-stage postconviction process, the State may seek to dismiss a successive postconviction petition on any grounds, "including the defendant's failure to prove cause and prejudice for not having raised the claims in the initial postconviction petition." *Bailey*, 2017 IL 121450, ¶ 26. In this instance, the State could, and did, ask the trial court to dismiss defendant's successive petition for failing to make a showing of either cause or prejudice for failing to raise his claims in his earlier postconviction petition.

¶ 73    Second, despite defendant's argument to the contrary, the record also reflects the trial court relied on the State's cause-and-prejudice argument when granting its motion to dismiss. In particular, when denying defendant's motion to reconsider the dismissal of his successive postconviction petition, the court stated as follows:

> "The Court did allow a successive filing of a Post-Conviction Petition and did appoint counsel to assist the Defendant. The State challenged the allowance of the successive petition. Upon review of the pleadings and arguments at hearing on the State's objection the Court denied the successive petition finding the claim was not newly discovered evidence, that it was cumulative and was evidence which *was available at trial and at the earlier Post-Conviction filing*." (Emphasis added.)

The court's comments indicate it did not find defendant to have adequately alleged cause and

prejudice and that it faulted him for not raising his ineffective-assistance claims in his initial postconviction proceeding.

¶ 74 However, even setting aside issues related to forfeiture and the cause-and-prejudice test, we are also persuaded by the State's alternative argument that defendant's successive postconviction petition failed to make a substantial showing of ineffective assistance of counsel.

¶ 75 Ineffective-assistance-of-counsel claims are evaluated under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), under which a defendant must establish both that his counsel's performance was deficient and that he was prejudiced as a result. *Dupree*, 2018 IL 122307, ¶ 44. In particular, "a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 76 In arguing that his successive petition made a substantial showing of a constitutional violation, defendant points out that his own affidavit showed he informed his trial counsel that Mundy, Kyle Connell, and Cawthon were witnesses available to testify in his defense at trial. He maintains his counsel was ineffective for not calling the witnesses because (1) Mundy's testimony would have contradicted prejudicial testimony from Gettings, a State witness and (2) testimony from Kyle and Cawthon would have suggested that defendant did not conspire with Blumenberg because the two were no more than acquaintances. In our view, defendant overstates the value of each witness's proposed testimony.

¶ 77 First, although Mundy's statements in her affidavit indicate she would have contradicted a portion of Gettings's testimony regarding the 2001 incident and who provided a list of ingredients for making methamphetamine, nothing in her affidavit otherwise contradicts

defendant's involvement in that incident or Gettings's testimony that it was defendant who provided the Coleman fuel that was found by the police. The record also shows defendant ultimately pleaded guilty to a methamphetamine-related offense arising out of that 2001 incident, and he readily admitted at trial that he knew how to make methamphetamine, even setting forth a list of the necessary ingredients. Additionally, as the State points out on appeal, a competent trial attorney may have elected not to call Mundy to avoid the risk of further highlighting defendant's prior methamphetamine-related activities.

¶ 78       Second, defendant relies on statements from Kyle Connell and Cawthon that defendant "had little to no dealings" with Blumenberg and that he "was not involved with Blumenberg in any way." However, neither witness's affidavit shows they had any relevant information pertaining to the specific events at issue, occurring on or around November 26, 2014. Moreover, testimony that defendant had no dealings or involvement with Blumenberg was refuted by defendant's own statements both to the police and when testifying on his own behalf at trial. It was undisputed that defendant gave Blumenberg Coleman fuel, and defendant admitted during his recorded interview both that he purchased methamphetamine from Blumenberg and that he was aware Blumenberg and Burge were manufacturing methamphetamine. When testifying, defendant described being visited by Blumenberg at his residence and receiving a phone call from him. He also admitted smoking methamphetamine with Blumenberg on November 25, 2014, the day before his delivery of Coleman fuel. Under these circumstances, the factual allegations of defendant's petition do not show either deficient performance by his trial counsel or that he suffered any prejudice.

¶ 79              D. Reasonable Assistance of Postconviction Counsel

¶ 80       Finally, as stated, defendant raises the alternative argument on appeal that Filbert

failed to provide a reasonable level of assistance as his postconviction counsel. He contends the record negates Filbert's certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) because it shows Filbert did not adequately present his claims of error. Specifically, defendant complains that Filbert failed to (1) amend his *pro se* petition, (2) counter the State's "incorrect arguments" made in connection with its motion to dismiss, or (3) interview his witnesses to obtain updated affidavits.

¶ 81        The sixth amendment (U.S. Const., amend. VI) right to the effective assistance of counsel does not extend to postconviction proceedings. *People v. Custer*, 2019 IL 123339, ¶ 30, 155 N.E.3d 374. Instead, under the Act, a postconviction petitioner is only entitled to receive a reasonable level of assistance, "a standard that is significantly lower than the one mandated at trial by our state and federal constitutions." *Id.* The rationale for the lower standard is that a defendant's presumption of innocence "is stripped away" upon conviction. *Id.* ¶ 31.

¶ 82        Rule 651(c) applies when the circuit court appoints counsel for a defendant who has initially filed a *pro se* postconviction petition. *People v. Cotto*, 2016 IL 119006, ¶ 41, 51 N.E.3d 802. "Commensurate with the lower reasonable assistance standard mandated in postconviction proceedings, [Rule 651(c)] sharply limits the requisite duties of postconviction counsel." *Custer*, 2019 IL 123339, ¶ 32. The rule requires that postconviction counsel certify that he or she has (1) consulted with the defendant by phone, mail, electronic means or in person to ascertain the defendant's contentions of deprivation of constitutional rights, (2) examined the record of the proceedings at the trial, and (3) "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of [the defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 83        "Compliance with [Rule 651(c)] is mandatory [citation], but once postconviction

counsel files a Rule 651(c) certificate, a rebuttable presumption of reasonable assistance arises." *People v. Addison*, 2023 IL 127119, ¶ 21, 217 N.E.3d 1011. "The defendant bears the burden of overcoming that presumption by showing that postconviction counsel did not substantially comply with the strictures of the rule." *Id.* Where postconviction counsel did not comply with Rule 651(c), supreme court "case law dictates that the cause should be remanded without a consideration of whether the petition's claims have merit." *Id.* ¶ 33. Whether postconviction counsel provided reasonable assistance is reviewed *de novo. People v. Jones*, 2017 IL App (4th) 140594, ¶ 31, 72 N.E.3d 449.

¶ 84        Here, the record reflects Filbert filed a facially valid Rule 651(c) certificate, stating he had consulted with defendant by mail and phone; examined the trial court file and the report of proceedings for defendant's trial, sentencing, and "subsequent matters"; and had made a necessary amendment to defendant's *pro se* filing, which involved a motion to consolidate the affidavit exhibits. Accordingly, a presumption exists that Filbert provided reasonable assistance. Defendant's arguments on review fall short of showing that Filbert's certificate of compliance with any of the specific and limited duties of Rule 651(c) is rebutted by the record.

¶ 85        On appeal, defendant makes no claim that Filbert failed to consult with him or that he did not examine the record of proceedings at his trial. Although defendant does complain that Filbert failed to properly amend his *pro se* filing, in his appellant's brief, he fails to identify any necessary amendment that Filbert should have made. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an appellant's opening brief are forfeited).

¶ 86        In his reply brief, defendant suggests Filbert should have filed an amended petition that included controlling precedent, explained his ineffective-assistance claims, or properly pleaded actual innocence by alleging the evidence he relied upon was material and conclusive.

Ultimately, however, an amended pleading is only needed when necessary to adequately present a defendant's claims. In this instance, defendant's *pro se* petition included affidavits from his proposed witnesses, descriptions of each witness's proposed testimony; and assertions that such testimony was newly discovered, favorable to him, corroborative of his claims that he was "not culpable to a conspiracy," and contradictory to the testimony of the State's witnesses. Defendant further alleged that his counsel was ineffective for not calling his proposed witnesses at trial, although they were known to him. He maintained he was prejudiced by his counsel's failure to present testimony from "key witnesses that could have corroborated [his] story and contradicted the State's theory." We find defendant's *pro se* petition adequately presented his contentions.

¶ 87    As noted, defendant also claims Filbert provided unreasonable assistance because he failed to interview Burge and Roy Connell and obtain updated affidavits from them. However, affidavits from both witnesses were attached to defendant's *pro se* petition, and defendant cites no authority to support the contention that his postconviction counsel had a duty under Rule 651(c) to procure new affidavits from those same witnesses in a search for "additional helpful information." See *People v. Mendoza*, 402 Ill. App. 3d 808, 817, 931 N.E.2d 703, 711 (2010) (stating that to the extent the defendant claimed "that 'admissible evidence' missing from his petition exist[ed] outside the record, there [was] no duty on postconviction counsel to discover that evidence").

¶ 88    Finally, defendant claims Filbert's certificate of compliance with Rule 651(c) is rebutted by his failure to file a response to the State's motion to dismiss and his failure to sufficiently counter the State's arguments at the hearing on that motion. However, we find none of defendant's contentions on appeal affirmatively demonstrate Filbert's noncompliance with any of Rule 651(c)'s specific and limited duties requiring consultation with defendant, examination of

the trial record, or amendment to defendant's *pro se* filing. Accordingly, under the circumstances presented, we find defendant has failed to rebut the presumption that Filbert complied with Rule 651(c) and provided reasonable assistance.

¶ 89　　　　As noted by the State, courts have also held that when Rule 651(c) compliance is not at issue or no longer at issue, a general reasonableness standard otherwise applies to postconviction proceedings. See *Cotto*, 2016 IL 119006, ¶ 41, 51 N.E.3d 802 (stating the reasonable assistance standard generally applies to all postconviction defendants without reference to Rule 651(c) and, although the rule is one vehicle for ensuring a reasonable level of assistance, it "should not be viewed as the only guarantee of reasonable assistance in postconviction proceedings"); *People v. Smith*, 2022 IL 126940, ¶ 38, 210 N.E.3d 1240 ("[I]f postconviction counsel performs unreasonably—even after a presumption has arisen that there has been compliance with Rule 651(c)—postconviction petitioners are not foreclosed from pursuing a claim that counsel failed to provide a reasonable standard of representation."). When compliance with Rule 651(c) is not at issue, the alleged unreasonable performance by postconviction counsel must prejudice the defendant. *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 44, 145 N.E.3d 705. Here, to the extent defendant has alleged unreasonable performance by Filbert outside the context of Rule 651(c)'s limited duties, he cannot establish prejudice. Specifically, for the reasons already expressed, defendant's petition failed to make a substantial showing of either actual innocence or ineffective assistance of counsel.

¶ 90　　　　　　　　　　　　III. CONCLUSION

¶ 91　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 92　　　　Affirmed.