2026 IL App (1st) 242211-U

SECOND DIVISION
March 31, 2026

No. 1-24-2211

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 98 CR 0511901 |
| | ) | |
| SAMUEL ROSS, | ) | |
| | ) | Honorable Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

**ORDER**

¶ 1  *Held:* The trial court did not err in denying defendant's motion for leave to file a successive postconviction petition. Affirmed.

¶ 2  Following a jury trial, defendant Samuel Ross was convicted of first degree murder and armed robbery, and the trial court sentenced him to consecutive terms of 55 years' and 30 years' imprisonment, respectively. We affirmed his convictions and sentences on direct appeal (see *People v. Ross*, No. 1-02-0723 (2004) (unpublished order under Rule 23)), and we subsequently granted appointed counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987) (see *People v. Ross*, 2012 IL App (1st) 112532-U). Defendant subsequently filed a motion

for leave to file a successive postconviction petition, which the court denied. On appeal, he contends that he satisfied the cause-and-prejudice test for his constitutional challenge to his 85-year *de facto* life sentence for offenses he committed at the age of 17. We affirm.

¶ 3                                    BACKGROUND

¶ 4    Defendant was charged with the armed robbery and first degree murder of Shereese Guider (Guider).[1] We have fully set forth the facts in defendant's direct appeal. See *Ross*, No. 1-02-0723 (2004) (unpublished order pursuant to Supreme Court Rule 23). We will thus limit our discussion of the facts to those relevant to the issues presented in this appeal.

¶ 5    On January 15, 1998, Guider left her home around 6:30 a.m. Shortly thereafter, she was seen driving with an unidentified person in the passenger seat. By 7:15 a.m., her body was discovered in an alley near her vehicle. Although she was still wearing jewelry, her cell phone, wallet, cash, and identification were missing. A broken knife blade was recovered nearby. Police investigation led to defendant, who lived across the street from Guider. After receiving *Miranda* warnings, defendant ultimately gave a handwritten statement. Defendant's signed statement was witnessed by an assistant state's attorney and detectives.

¶ 6    In the handwritten statement, defendant stated that, after his mother went to a bus stop at approximately 5:30 a.m. on January 15, defendant returned to the apartment and smoked a "rock" of cocaine and drank a shot of Crown Royal liquor. Afterwards, he went back outside to "hit a lick" (*i.e.*, to rob somebody) and saw Guider getting into her car. Defendant asked her for a ride, and she agreed. Defendant said she drove him where he wanted to go, but there was no one there to rob. While she was driving, he decided to steal her phone.

---

[1] Although Guider's first name is also spelled "Sharese" in the record and in our order disposing of defendant's direct appeal, we will use the spelling "Shereese," the same spelling used throughout the record and in the victim impact statement of Guider's daughter.

¶ 7    Guider let him use her phone. Defendant pretended to make a call and then tried to hide the cell phone in his pants, but Guider saw him and stopped in an alley. Defendant abruptly got out of the car, but Guider followed him. When she came toward him, he took out a steak knife from his coat pocket and stabbed her. Guider did not have anything in her hands. When defendant saw that he had stabbed her in the neck, "he knew he had to kill" her because he was afraid of retaliation from her family. Defendant recalled that Guider was standing when he first stabbed her and continued stabbing her until she fell to the ground. At that point, defendant stabbed her in the leg, which caused the knife blade to bend. Defendant straightened the blade, saw that Guider was still moving, and he stabbed her one additional time. The knife blade then broke off the handle. Defendant fled the scene with Guider's cell phone and wallet. He tried unsuccessfully to call his father on her cell phone and then took $125 out of her wallet, throwing the wallet into a garbage can. Defendant used the money to buy cigarettes, crack cocaine (some of which he smoked), and $20 worth of marijuana. Defendant then sold Guider's cell phone for $30. Defendant admitted to his mother and two individuals that he killed Guider. Michael Anderson subsequently testified that defendant admitted the crime to him shortly after it occurred.

¶ 8    The medical examiner who conducted Guider's autopsy testified as an expert witness and stated that there were between 50 and 60 sharp force wounds (*i.e.*, wounds caused by a knife or sharp instrument) on Guider's body from her head (including her left eye and cheek) down to her chest, one of which struck the aorta, causing her to bleed to death internally. Guider also had stab wounds in the right "mid side" of her back that penetrated the ribs, stab wounds to her right buttock and thigh, and various incised wounds to her hands. Tests for alcohol, opiates, and cocaine were all negative. The medical examiner opined that her cause of death was multiple stab wounds and the manner of death was homicide.

¶ 9    Following deliberations, the jury found defendant guilty of first degree murder and armed robbery.  The trial court then continued the cause for sentencing and ordered the preparation of a presentence investigation report (PSI).

¶ 10    On December 3, 2001, defendant's PSI was filed with the court.  The PSI indicated in part that defendant's date of birth was May 1, 1980.  The PSI further indicated no juvenile adjudications or adult convictions.  Defendant described his relationships with his father and mother as close and very close, respectively, and that he frequently speaks with his mother.  Defendant further characterized his childhood as normal and never having suffered any kind of abuse.  Defendant affirmed that he was not neglected, never ran away from home, and was never involved with the Department of Children and Family Services.  Defendant said that neither he nor his family members have substance abuse problems or criminal backgrounds, but he admitted that he was 15 when he first tried alcohol (which he consumes once per week) and marijuana (which he uses three times per week).  He denied using any other illegal substances.  Defendant also denied ever having been involved with a street gang but conceded that some of his friends were affiliated with the "Vice Lords" street gang and have a "criminal background."

¶ 11    On January 23, 2002, the trial court held defendant's sentencing hearing.  The trial court first noted that defendant's PSI needed to be corrected to state that a jury (and not the trial court) had found defendant guilty.  The parties did not have any further additions or corrections to the PSI. The cause then proceeded to arguments in aggravation and mitigation.

¶ 12    Arguing in aggravation, the State recounted that defendant had stabbed Guider nearly 60 times, "sliced her throat at least three separate times," and only obtained her cell phone and "a little over $100 in cash."  The State further recalled defendant stabbing Guider until the knife blade

4

bent, which he then straightened out and "continued stabbing her." The State asked for an "appropriate" sentence, condemning his "butchering another human being" merely to buy "dope."

¶ 13 Defense counsel argued that defendant, a "young guy," had "absolutely no background, no contact with the law up until this point." Based upon defendant's lack of a criminal history, family support, and favorable background, his Counsel asked for a sentence that reflected "mercy, *** tempering the good parts and the bad parts that you have seen in this case."

¶ 14 Defendant elected to make a statement in allocution, denying murdering Guider, noting that he had been in custody for four years and that at the time of the murder, "I was 17." Defendant added that, as a 17-year-old, "You can intimidate a person." Apparently addressing the State's witnesses, defendant stated, "You know what happened at the station. Why you didn't [*sic*] tell the truth?" Defendant repeated that he was "a little boy" and again denied murdering Guider.

¶ 15 The trial court then announced its findings. The court noted in relevant part that, in mitigation, defendant did not have a history of prior delinquency or criminal activity and that his incarceration would result in hardship on his family members because defendant helps care for a developmentally disabled brother. The court, however, disagreed that defendant's criminal conduct would not recur. In aggravation, the court found that defendant's conduct caused serious harm and that the sentence is necessary to deter others. Noting that defendant did not "just" kill Guider, he "overkilled her," the court sentenced defendant to consecutive terms of 55 years' and 30 years' imprisonment for the first degree murder and armed robbery convictions, respectively.

¶ 16 On direct appeal, defendant contended that (1) the trial court erroneously allowed inadmissible hearsay statements into evidence, (2) the State failed to comply with the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), (3) trial counsel was ineffective, and (4) the trial court erred in sustaining the State's hearsay objection to a portion of Marcus Anderson's testimony.

5

*Ross*, No. 1-02-0723 (unpublished order pursuant to Supreme Court Rule 23). This court, however, rejected his claims of error, noting in part "the overwhelming evidence of defendant's guilt," and affirmed his convictions and sentences. *Id.*

¶ 17    On May 12, 2005, defendant filed his initial postconviction petition. This court, however, granted postconviction counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), affirming his convictions and sentences. *Ross*, 2012 IL App (1st) 112532-U.

¶ 18    On March 14, 2024, defendant filed a motion for leave to file a successive postconviction petition, alleging his sentence violated both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII)[2] and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Defendant argued he met the cause prong of the cause-and-prejudice test because (1) "sweeping" changes in sentencing laws ("730 ILCS 5/5-4.5-105") and (2) the decisions in *People v. Buffer*, 2019 IL 122327, and *Miller v. Alabama*, 567 U.S. 460 (2012) occurred after he had filed his initial postconviction petition. Defendant argued he met the prejudice prong of the cause-and-prejudice test because he was not sentenced "under these new guidelines for sentencing a juvenile" and received a "*de facto* life sentence" for offenses he committed when he was 17 years old.

¶ 19    On May 31, 2024, the trial court denied defendant's motion. On November 18, 2024, this court granted defendant's motion for leave to file a late notice of appeal. This appeal follows.

¶ 20                                    ANALYSIS

¶ 21    Defendant contends that the trial court erroneously denied his motion for leave to file a successive postconviction petition. Specifically, defendant argues that he satisfied the cause-and-prejudice test of his proportionate penalties challenge to his aggregate 85-year *de facto* life

---

[2] Defendant does not pursue this claim in this appeal.

sentence for offenses that were committed when he was 17 years old. Defendant argues that he met the cause prong of the cause-and-prejudice test based upon "legislative changes and sentencing practices that have evolved since his sentencing in 2002," which he asserts were unavailable to him at the time he filed his initial postconviction petition. Defendant also argues that he met the prejudice prong because, although he was only 17 years old and had "no criminal history whatsoever" at the time of the offense, he nonetheless received a *de facto* life sentence that did not reflect "his personal circumstances, diminished culpability, and increased rehabilitative potential," in addition to his age and the "attendant factors of youth."

¶ 22   The Act allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999). Principles of *res judicata* and waiver will limit the range of issues available to a postconviction petitioner " 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)). Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata,* and issues that could have been raised in the earlier proceedings, but were not, will ordinarily be deemed forfeited. *Id.* at 274; 725 ILCS 5/122-3 (West 2024).

¶ 23   Moreover, the Act provides that only one petition may be filed by a petitioner without leave of court. 725 ILCS 5/122-1(f) (West 2024). As a result, successive postconviction petitions are "highly disfavored." *People v. Bailey*, 2017 IL 121450, ¶ 39. The granting of leave to file a successive petition is governed by the cause-and-prejudice test, where cause is defined as some objective factor external to the defense that impeded efforts to raise the claim in an earlier

proceeding, and prejudice occurs where the alleged error "so infected" the trial that the resulting conviction or sentence violates due process. *Id.* ¶ 14 (quoting 725 ILCS 5/122-1(f) (West 2024)).

¶ 24 To meet the cause-and-prejudice test for a successive petition, a petitioner must " 'submit enough in the way of documentation to allow a circuit court to make that determination.' " *People v. Smith*, 2014 IL 115946, ¶ 35 (quoting *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010)). Both elements of the cause-and-prejudice test must be met for the petitioner to prevail. *People v. Pitsonbarger*, 205 Ill. 2d 444, 464 (2002). The cause-and-prejudice test is a "more exacting standard" than the " 'gist' standard" under which initial postconviction petitions are reviewed. *People v. Conick*, 232 Ill. 2d 132, 142 (2008). We review the denial of leave to file a successive petition *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 25 Defendant contends that his sentence violates the proportionate penalties clause of the Illinois constitution. This clause provides in relevant part that "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and "the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 26 In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the United States Supreme Court held that the eighth amendment (applicable to the states through the fourteenth amendment, see *Robinson v. California*, 370 U.S. 660 (1962)) prohibits imposing on juvenile offenders mandatory life in prison without the possibility of parole. Our supreme court further held that sentencing a juvenile

to a mandatory term of years that is the functional equivalent of life without the possibility of parole (*i.e.*, a *de facto* life sentence) violates the eighth amendment. *People v. Reyes*, 2016 IL 119271, ¶ 9. Finally, in *People v. Buffer*, 2019 IL 122327, the court held that a sentence that exceeds 40 years is a *de facto* life sentence (*Id.* ¶¶ 41-42) and that this holding is both retroactive and cognizable in a petitioner's postconviction proceeding (*Id.* ¶ 46).

¶ 27 In *People v. Dorsey*, 2021 IL 123010, however, our supreme court limited the reach of *Miller*-based claims brought within the context of a proportionate penalties challenge. See *People v. Hewitt*, 2025 IL App (1st), ¶ 71 (observing that *Dorsey* "cleared some of the weeds"). In *Dorsey*, the 14-year-old defendant was convicted following a jury trial in August 1998 of, *inter alia*, one count of first degree murder and two counts of attempted first degree murder. *Id.* ¶ 5. Following a lengthy sentencing hearing, the trial court sentenced defendant to an aggregate term of 76 years' imprisonment. *Id.* ¶ 19. In December 2014, defendant filed a motion for leave to file a successive postconviction petition, alleging his sentence violated the eighth amendment pursuant to *Miller*. *Id.* ¶ 23. The trial court denied defendant leave to file his successive petition, and this court affirmed. *Id.* ¶¶ 26-28. On further appeal to our supreme court, defendant argued in part that his sentence violated the proportionate penalties clause of the Illinois constitution. *Id.* ¶ 68. The court first held that defendant's proportionate penalties claim was both (1) forfeited (because he failed to raise the issue in the trial court, the appellate court, or in his petition for leave to appeal in the supreme court) and (2) barred by the doctrine of *res judicata* (because he had raised a proportionate penalties claim on direct appeal). *Id.* ¶¶ 70, 73.

¶ 28 The *Dorsey* court, however, further held that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *Id.* ¶ 74. Noting that the defendant acknowledged that "Illinois

courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing," the court held that that "unavailability" of the substantive rule announced in *Miller* prior to its 2012 filing "at best deprived defendant of 'some helpful support' for his state constitutional law claim," which the court held was insufficient to establish cause. See *id.* (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59). Finally, the court further added that this unavailability did not justify either the defendant's failure to raise the issue in the courts below, "waiting to raise it instead for the first time before this court." *Id.*

¶ 29 Here, the holding in *Dorsey* forecloses defendant's claim on appeal. As the *Dorsey* court noted, our state has long recognized the difference in maturity between adults and juveniles. See, *e.g.*, *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894) (recognizing that there is "a marked distinction between persons of mature age and those who are minors,—the habits and characters of the latter are presumably, to a large extent, as yet unformed and unsettled"). As such, Illinois courts have recognized the difference in the behavior of juveniles compared to adults for more than a century prior to *Miller*'s "announcement." *Miller*'s belated holding cannot therefore serve as cause for a defendant's failure to challenge his sentence under the proportionate penalties clause based upon his status as a juvenile at the time of the offense.

¶ 30 We also reject defendant's attempt to distinguish *Dorsey* on the basis that the court there found the defendant's claim both forfeited and barred by *res judicata*. To the extent that defendant is implying that *Dorsey*'s discussion that *Miller* does not provide cause for failure to raise a proportionate penalties claim was mere *dicta*, we note that this issue was fully briefed before the *Dorsey* court, so at a minimum, the statements were judicial *dicta*, which has "the force of a determination by a reviewing court and should receive dispositive weight in an inferior court."

*People v. Williams*, 204 Ill. 2d 191, 206 (2003). Accordingly, even if the discussion in *Dorsey* is *dicta*, it is judicial *dicta*, which is tantamount to a determination by that court.

¶ 31    Defendant additionally complains that he could not have successfully raised his as-applied challenge to his sentence based on his status as a juvenile in his initial postconviction petition because Illinois law at that time "considered him an adult, and he thus lacked necessary corroborating evidence." The evidence was not lacking, however. The law did not change his age; it merely subjected him to a term of imprisonment because of it.

¶ 32    We further note that, at the time of the offense, the sentencing range for first degree murder was from 20 to 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 1998). In addition, armed robbery was classified as a class X felony offense with a sentencing range from 6 to 30 years' imprisonment. 720 ILCS 5/18-2(b) (West 1998) (armed robbery a class X offense); 730 ILCS 5/5-8-1(a)(3) (West 1998) (class X sentencing range). Defendant was further eligible for day-for-day good conduct credit. See 730 ILCS 5/3-6-3(a)(2) (West 1998). Accordingly, based upon these sentencing ranges in effect—and even assuming consecutive sentences and no good-conduct credit—defendant at no point was subject to a mandatory *de facto* life sentence. His minimum consecutive sentence could have been as low as 26 years, which fatally undermines his argument. Even sentenced as an adult, he was nonetheless able to challenge any sentence that would exceed 40 years (inclusive of any potential good conduct credit) based upon his youth. As the *LaPointe* court stated, "new research that reinforced the long-standing wisdom that juveniles have less impulse control, mental and emotional development, and fixity of character than *** adults" merely added to "the received wisdom in favor of according a defendant's youth great weight in sentencing." *LaPointe*, 2018 IL App (2d) 160903, ¶ 58. As a consequence, *Miller*'s nonexistence at the time of defendant's initial postconviction petition at best merely deprived him

of "some helpful support" (namely, "new scientific knowledge") for "an already viable claim." *Id.* ¶ 59. Therefore, his argument that he was deemed an adult at the time and thus could not have raised this challenge to his sentence is unpersuasive.

¶ 33    For that reason, his reliance upon *People v. Blalock*, 2022 IL 126682, is unavailing. In that case, our supreme court agreed that the defendant's inability to provide evidence of "a pattern and practice of police brutality" because that evidence "was not reasonably available to him prior to the time he filed his successive postconviction petition in 2016" established cause. *Id.* ¶ 40. Here, by contrast, defendant asserts that his age at the time of the offense warranted a reduced sentence. This evidence was plainly before the trial court, not only in defendant's PSI, but also throughout his statement in allocution immediately prior to sentence, when he repeatedly stated that he was "17" and "a little boy," and when he implied that a 17-year-old can be intimidated (presumably into falsely confessing to a crime). *Blalock* is thus inapt. Since defendant cannot meet both elements of the cause-and-prejudice test, the trial court did not err in denying his motion for leave to file a successive postconviction petition. See *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 34    Moreover, even assuming, *arguendo*, that defendant met the cause prong, he cannot establish prejudice. As noted above, a sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Sharpe*, 216 Ill. 2d at 487. The facts of this case illustrate the brutal senselessness of the victim's death. Defendant's handwritten statement indicated that, after smoking a "rock" of cocaine and drinking a shot of liquor, defendant decided to rob somebody. Defendant asked the victim (who knew defendant) for a ride, and she agreed, taking him to his destination. When defendant saw no one to rob, he decided to steal the victim's cell phone. When the unarmed victim confronted defendant, however, defendant repeatedly stabbed her until she fell to the ground.

Defendant stated that he "had to" kill her because of a fear of retaliation from her family. Defendant did not stop stabbing the victim even after the knife blade bent, however; he simply straightened the blade and continued stabbing her, only stopping when the blade finally broke off of the handle. Defendant fled the scene with the victim's cell phone (which he sold for $30) and $125 from her wallet, and he later used the money to buy cigarettes and drugs. Testimony revealed that the victim suffered between 50 and 60 stab wounds, including to her left eye and cheek, as well as her aorta, which caused her to bleed to death internally. On these facts, no reasonable argument can be made that the trial court's sentence was "so wholly disproportionate to the offense as to shock the moral sense of the community." *Id.*

¶ 35    Nonetheless, defendant asserts that the trial court imposed a *de facto* life sentence based upon the serious harm and the need for deterrence but not "his personal circumstances, diminished culpability, and increased rehabilitative potential." We disagree.

¶ 36    We presume the trial court properly considered all relevant mitigating factors presented, absent some indication to the contrary other than the sentence itself. See *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21; *People v. Madura*, 257 Ill. App. 3d 735, 740 (1994). In addition, the court need not recite and assign a value to every mitigating factor upon which it relies. *Id.* at 740-41. "The fact that a court expressly mentions a factor in mitigation does not mean the court ignored other factors." *People v. Burton*, 184 Ill. 2d 1, 34 (1998) (citing *People v. Burrows*, 148 Ill. 2d 196, 254-56 (1992)). Again, defendant's young age and lack of a prior criminal history at the time of the offense was squarely before the court: in defendant's PSI, in defense counsel's argument in mitigation, and throughout his statement in allocution. Furthermore, it is axiomatic that a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010) (citing *People v. Coleman*, 166 Ill.

13

2d 247, 261 (1995)). Here, the court properly indicated that the sentence would reflect the seriousness of the offense. Defendant's argument is thus meritless.

¶ 37 Finally, we reject defendant's argument that he established prejudice because, although his sentence was discretionary and not mandatory, a trial court "nevertheless" may impose a *de facto* life sentence "only in narrow circumstances and after considering youth as a mitigating factor." Defendant cites section 5-4.5-105 of the Unified Code of Corrections (730 ICLS 5/5-4.5-105 (West 2024)) in support of this claim. Section 5-4.5-105, however, is not to be given retroactive effect and applies only for offenses committed "[o]n or after January 1, 2016." *Id.* Defendant's offense and his sentence hearing took place well before that date. We thus reject this final claim.

¶ 38                                          CONCLUSION

¶ 39 For the foregoing reasons, we reject defendant's contention that the trial court erred in denying his motion for leave to file a successive postconviction petition. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 40 Affirmed.